# Exhibit A

FILED
IN CLERKS OFFICE

2006 JUN -9  P 12: 16

U.S. DISTRICT COURT
DISTRICT OF MASS.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

JOANNE DANIELS-FINEGOLD, ROGERA )
ROBINSON, GENE SMITH, REGINALD )
CLARK, MADELYN JOAN GOLDEN, )
MYRNAIRIS CEPEDA, MAUREEN CANCEMI, )
ANDREW FORMAN, DANFORD LARKIN, )
ROBERT PARK, THOMAS GILBERT, )
and BOSTON CENTER FOR INDEPENDENT )
LIVING, individually and as class representatives, )
                                                   )     C.A. No. 02 CV 11504 MEL
            Plaintiffs,                            )
                                                   )
vs.                                                )
                                                   )
MASSACHUSETTS BAY TRANSPORTATION )
AUTHORITY,                                         )
                                                   )
            Defendant.                             )

## ORDER FOR FINAL JUDGMENT

In light of the June 15, 2006, fairness hearing held by the Court to determine whether the

parties' Settlement Agreement should be finally approved as fair, reasonable, and adequate,

IT IS HEREBY ORDERED:

1.      The Settlement Agreement is hereby finally approved pursuant to Fed. R. Civ. P.

23(e) as fair, reasonable and adequate, and the Settlement Agreement shall be consummated in

accordance with its terms and provisions;

2.      The form and method of notice of the Settlement Agreement given to the class

complied with the requirements of Rule 23 of the Federal Rules of Civil Procedure, satisfied the

requirements of due process, was the best notice practicable under the circumstances, and

constituted due and sufficient notice of the Settlement Agreement, the fairness hearing, and other

matters referred to in the notice to all persons entitled to receive such notice;

3.    The class members in this case include all individuals with mobility, hearing, or visual disabilities, as defined by Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131(2), who use, will use, or would use the bus, light rail, and heavy rail rapid transit services operated by the MBTA who are, or will in the future be, denied equal use of these services because the services are not readily accessible to and usable by individuals with such disabilities;

4.    The class members, all and each of them (including plaintiffs), are hereby bound by the terms of the Settlement Agreement;

5.    The class members are deemed to have released and forever discharged the MBTA with respect to the claims that are released in the Settlement Agreement, which is incorporated by reference herein and attached hereto as Exhibit 1;

6.    The class members are hereby permanently barred and enjoined from instituting or prosecuting, either directly, representatively, derivatively or in any other capacity, any action against the MBTA asserting any of the claims released by them in the Settlement Agreement;

7.    The Court, without affecting the finality of this Order for Final Judgment, hereby retains and reserves jurisdiction over implementation and performance of the Settlement Agreement pursuant to the terms of the Settlement Agreement; and

8.    The Court orders the entry of final judgment dismissing this case with prejudice and without costs.

Dated:   June 15, 2006

_Morris E. Lasker_
Morris E. Lasker
United States District Judge

1535887.2

2

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

JOANNE DANIELS-FINEGOLD, ROGERA )
ROBINSON, GENE SMITH, REGINALD )
CLARK, MADELYN JOAN GOLDEN, )
MYRNAIRIS CEPEDA, MAUREEN CANCEMI, )
ANDREW FORMAN, DANFORD LARKIN, )
ROBERT PARK, THOMAS GILBERT, )
and BOSTON CENTER FOR INDEPENDENT )
LIVING, individually and as class representatives, )
                                      )          C.A. No. 02 CV 11504 MEL
            Plaintiffs            )
                                        )
vs.                                      )
                                        )
MASSACHUSETTS BAY TRANSPORTATION )
AUTHORITY, )
                                        )
            Defendant.         )

## SETTLEMENT AGREEMENT

### Introduction

On July 25, 2002, the plaintiffs brought this civil action for declaratory and injunctive

relief against the MBTA ("the Lawsuit"). On February 17, 2004, the Court certified the

plaintiffs' proposed class in the lawsuit. The plaintiffs and the MBTA desire to settle fully and

finally any and all differences and disputes between them pertaining to the subject matter of the

lawsuit by entering into this agreement. In entering into this agreement, the MBTA does not

admit any wrongdoing or liability to the plaintiffs, and this agreement will not be construed as an

admission of wrongdoing or liability.

This agreement is based on a shared vision between plaintiffs and the MBTA to make the MBTA a model transit system accessible to all. There is a mutual commitment and desire to comply not only with the letter but also the spirit of the Americans with Disabilities Act, with the complete understanding that all people with disabilities must have every opportunity to be fully participating members of our community and that fundamental to this opportunity is the right and ability to use public transportation in an equal, effective, and dignified manner.

In consideration for the mutual promises contained herein, the plaintiffs and the MBTA agree as follows:

## Bus Operations

1. All MBTA buses will be operated in a manner that makes them readily accessible and usable by persons with disabilities. Proper operation includes, but is not limited to, following official MBTA procedures in:

   a. collecting fares, including purchasing and maintaining accessible automated fare system

   b. using appropriate language;

   c. treating passengers with disabilities with courtesy and respect;

   d. assisting passengers who are blind and visually impaired upon request;

   e. assisting passengers with hearing impairments upon request;

   f. recognizing and assisting passengers with mobility impairments upon request;

   g. requesting passengers without disabilities who occupy priority seats to vacate these seats for a passenger with a disability.

   h. pulling buses into curbs at bus stops;

   i. using lifts, ramps or kneelers for passengers with disabilities who do not use wheelchairs;

   j. assisting passengers with hidden disabilities upon request;

k.  offering and using lifts and ramps for passengers using wheelchairs and scooters;

l.  providing and using securement devices for passengers using wheelchairs and scooters;

m. maintaining all signage, including scrolling marquees in clean, visible and operable condition;

n.  maintaining both interior and exterior audio announcement equipment in audible and operable condition;

o.  providing cards in Braille and print indicating the bus route and destination;

p.  accommodating and assisting passengers using service animals; and,

q.  assisting with obtaining appropriate alternative transportation when required.

2.  The MBTA shall revise the Bus Operations Rules for Operators and other Employees of Bus Operations (October 1, 2001) and any regulations, general and special orders, or bulletins related to the procedures set forth in paragraph 1 in accordance with the terms of Addendum A to this agreement.

3.  The badge number of the bus operator for each MBTA bus shall be displayed prominently while the bus is in service.

## Bus Maintenance

4.  All accessibility equipment and devices on buses will be maintained in operable condition and in compliance with the highest accessibility standards. All accessibility equipment and features on buses will be cleaned as required to ensure proper functioning at all times. Lifts, kneelers and ramps shall be cleaned on a daily basis. Ramps and lifts shall be vacuumed, at a minimum, every six weeks. In addition, the lifts on the Zero Series buses shall be vacuumed at least once per week during the winter months. All signage shall be cleaned at a minimum, weekly, and more often during the winter and severe weather conditions to ensure that the

- 3 -

route, destination and bus number is clearly visible at all times during operations.

Securement belts, shoulder straps and flip seats shall be cleaned on a monthly basis or more

often if warranted, and shall be replaced immediately when they cannot be cleaned, are worn

significantly, are torn or otherwise damaged irreplaceably.

5.  The MBTA shall establish and shall continue to employ a system of regular and frequent

maintenance checks of all accessibility features on all buses. The system for maintenance

checks shall include records documenting the operation, inspection, maintenance and repair

of all accessibility devices including the date of any action or observation, a description of

actions taken, and the names of employees involved. The items checked shall include, but not

be limited to:

a.  Lifts and ramps

b.  Securement belts, shoulder straps and flip seats

c.  Public address systems or annunciators and variable message systems

d.  Stop request systems

e.  Clear and lighted destination and bus route number signs

f.  Kneelers

g.  Internal and external decals

h.  Lift and stairwell lights

6.  With respect to lifts and ramps, the maintenance checks shall include daily lift and ramp

cycling to occur at the onset of each service day. Every bus with a lift or a ramp shall be

cycled at least once per week at the end of the day. If the maintenance checks disclose an

inoperative lift on a vehicle, the MBTA shall immediately remove that vehicle from service

-4-

for repairs and the MBTA shall not utilize the vehicle for service until the lift is repaired, except under the circumstances outlined in 49 C.F.R. §37.163(e) (i.e., the 3-day rule).

7. When a lift is discovered to be inoperative after a vehicle is in service it shall be removed from service at the end of the operator's run and cannot start a new service day before the lift is repaired, except under the circumstances outlined in 49 C.F.R. §37.163(e) (i.e., the 3-day rule). Any bus with an inoperable lift that is in service for the purpose of completing the operator's run, or under the circumstances outlined in 49 C.F.R. §37.163(e), shall stop at any stop where there is a customer who appears to require the use of a lift for boarding to explain why service cannot be provided on that bus and arrange for alternative transportation, if necessary, pursuant to 49 C.F.R. §37.163(f) and paragraphs 72 to 74.

8. All repairs to accessibility equipment must be made promptly, as required by 49 C.F.R. §37.16 1(b). The MBTA shall maintain a sufficient stock of repair parts and equipment to meet the requirement for prompt repairs. Equipment that cannot be repaired must be replaced promptly. In the event that inoperable accessible equipment reduces the general level of accessibility of any service, this shall trigger appropriate provisions for alternative services.

**Bus Purchase and Rehabilitation**

9. The MBTA shall purchase new low-floor buses so that it may, at least, maintain its current fleet size and existing service levels but comply with the following schedule for removing existing buses from its service fleet: a) all buses without lifts retired within 90 days after the effective date of this agreement, except for the existing inaccessible trackless trolleys which shall be replaced by new low-floor trackless trolleys by July 1, 2006 (except for five of the existing inaccessible trackless trolleys, which the MBTA may continue to use as a contingency fleet); b) all 8000 series buses (including all GMC and TMC buses, series 84

- 5 -

through 89) with lifts retired by January 1, 2007; and c) all 94 and 95 Nova buses retired in accordance with the schedule attached hereto as Addendum D. All future new low-floor buses shall provide an MBTA system map and locations for the display of pertinent information such as bus route maps, schedules and other system-wide information, and handles and grab bars in adequate quantity and of contrasting color and texture throughout the vehicles. The MBTA agrees to engage in a discussion with the plaintiffs about designing future new low-floor buses so that: (1) there is the highest degree of maneuverability possible for passengers using wheelchairs and scooters from the front door to the designated seating area: and (2) the wheelchair seating area exceeds 48" long to accommodate scooters and full size power wheelchairs.

10. All Nova buses with lifts must have new state-of-the-art lifts (VE-2 models or equivalent) installed by June 30, 2007, except for the following: (a) Nova buses that have already had new state-of-the-art lifts installed on them through either the Midwest contract or at the MBTA's Everett shops, through the in-house rehabilitation effort; and (b) the contingency fleet of up to 50 Nova buses which the MBTA intends to maintain.

11. The MBTA shall establish a group of qualified personnel independent of garage maintenance personnel, who shall conduct random surprise bus lift inspections on an ongoing basis. Such inspections shall be conducted for 10% of the fleet every month, the results of such inspections to be reported to senior management of each garage and senior agency management.

**Emergencies**

12. The MBTA shall ensure that there is a timely and effective response to any access-related emergencies or problems that arise while passengers are using bus services, to include the

- 6 -

provision of alternative transportation under the terms in paragraphs 72 to 74, as necessary. The MBTA shall develop procedures for evacuation of persons with disabilities in the event of an emergency.

## Performance Monitoring By the MBTA

13. The MBTA shall devise and implement an internal system for monitoring bus operator compliance with the Bus Operations Rules for Operators (as amended) and any applicable regulations, general and special orders, or bulletins. The monitoring shall specifically assess performance in the areas covered by paragraph 1. Reports of the results of monitoring shall be compiled on a quarterly basis, with the first results reported six months after the effective date of this agreement.

14. The MBTA shall review all current systems for monitoring bus operations, including ride checks, observations done following training and observations made as a result of complaints and modify those systems to incorporate observations about passenger service in general and service to individuals with disabilities in particular. Reports of the results of these observations shall be compiled on a quarterly basis, with the first results reported six months after the effective date of this agreement.

15. Reports summarizing complaints regarding bus services to passengers with disabilities (see paragraph 75 regarding complaints) shall be compiled according to nature of the complaint, bus route, operator, location and time of day on a quarterly basis.

16. The independent monitor appointed under paragraph 89 shall submit quarterly reports regarding bus operator performance. The first such quarterly report shall be submitted within 6 months after the effective date of this agreement.

17. Immediately following the receipt of the second quarterly reports under paragraphs 13 to 16

- 7 -

the MBTA and the plaintiffs shall meet for the purpose of establishing a benchmark for bus operator compliance with Rules for Bus Operators, any applicable regulations, general and special orders, or bulletins and the performance standards for the areas set forth in paragraph 1 The benchmark will include quantitative and qualitative measures of performance.

18. The MBTA's goal for bus operations is to ensure that bus operators comply with the requirements of paragraph 1 at all times. The MBTA will be considered in compliance with this agreement if bus operator performance improves from the level established by the benchmark set under paragraph 17 during the first two years that this agreement is in effect. Following the expiration of two years the MBTA will be considered out of compliance with paragraph 1 if bus operators fail to meet the requirements of that paragraph more than an insubstantial number of times during any one month period. Any dispute regarding the degree of compliance shall be resolved in accordance with the dispute resolution procedures in paragraph 100.

19. The results of all bus operations monitoring as set forth in paragraphs 13 to 18 shall be taken into consideration in all performance evaluations of bus operations management and supervisory personnel.

**Bus Service Planning**

20. The Service Planning department, in conjunction with Bus Operations, Marketing or any other appropriate department, shall explicitly consider the transportation needs of persons with disabilities in planning for bus services done under the 1997 Service Delivery Policy or any subsequent planning policies. Any outreach done in conjunction with bus service planning shall include outreach to persons with disabilities.

21. The MBTA shall develop a methodology to measure and count the number, general location, routes and time of day of passengers with disabilities, including passengers with disabilities that are not apparent, riding the fixed route bus and subway/light rail systems and shall use this information in the planning of route patterns, headways and other service planning considerations

**Train Operations**

22. Trains (subway and light rail) must be operated in a manner that makes them readily accessible and usable by persons with disabilities. Proper operation includes, but is not limited to, following official MBTA procedures in:

    a. collecting fares;

    b. using appropriate language;

    c. treating passengers with disabilities with courtesy and respect;

    d. assisting passengers who are blind and visually impaired upon request;

    e. assisting passengers with hearing impairments upon request;

    f. recognizing and assisting passengers with mobility impairments upon request;

    g. offering and using mobile lifts, "mini-high" platforms, ramps and other accessibility devices as needed or requested;

    h. assisting passengers with cognitive impairments upon request;

    i. assisting passengers with hidden disabilities upon request;

    j. requesting passengers without disabilities who occupy priority seats to vacate these seats for a passenger with a disability;

    k. maintaining all signage in clean, visible and operable condition;

    l. maintaining audio and visual announcement equipment in audible and operable

condition;

m. taking reasonable steps to eliminate any gaps between station platforms and vehicle floors that are in excess of the amount permitted by applicable regulations in accordance with paragraph 24;

n. assisting passengers using service animals; and,

o. assisting with obtaining appropriate alternative transportation when required.

23. The MBTA shall revise the Subway Operations Rules for Trainpersons – Heavy Rail (July 1, 2004) and the Rules for Trainpersons – Light Rail (January 1, 2000) and any regulations, general and special orders, or bulletins related to the procedures set forth in paragraph 1 in accordance with the terms of Addendum A to this agreement.

24. The MBTA shall conduct quarterly inspections of all Red, Orange, and Blue line stations to determine whether any gaps between station platforms and vehicle floors that are in excess of the amount permitted by applicable regulations. The MBTA shall conduct quarterly inspections of all Red, Orange and Blue line rail cars to determine if any defects need to be repaired or any adjustments made to address excessive platform gaps. Any excessive gap, identified through quarterly inspections or otherwise, shall be promptly addressed through track adjustments, subway car suspension adjustments and any other necessary means. The MBTA and the plaintiffs shall jointly investigate new technology and other methods to eliminate excessive platform gaps.

25. The MBTA shall, within six months after the effective date of this agreement, install fixed ramps and platforms (i.e. "mini-high" platforms) for use in boarding light rail vehicles other than the Type 8 – Breda vehicles as follows : BU Central (1),Washington St. (2), St. Mary's (1), Coolidge Corner (1), Washington Square (1), Brookline Hills (2), Newton Center (1),

Museum (1), Cleveland Circle (1) and Fenway (1). The commitments in this paragraph are contingent on the MBTA receiving any needed variances from the Architectural Access Board or any other permitting authority and are also contingent on the MBTA not encountering any unexpected circumstances, such as underground utility conflicts, in attempting to implement the mini-highs.

26. The MBTA shall perform a study concerning the future operation of the Mattapan High-Speed Trolley, including an assessment of whether to make the Mattapan High-Speed Trolley accessible.

27. The MBTA shall implement a regular and thorough preventive maintenance program for all mobile lifts that remain in operation after the date of this agreement. Each mobile lift shall be inspected on a daily basis and the inspection shall include actual operation of the lift. All MBTA personnel with any responsibility regarding mobile lifts shall be given training on their use and shall be given refresher training as needed. Train operators or station personnel shall notify the operations control center whenever a passenger boards using a lift and arrangements shall be made to have an official available at the passenger's destination waiting with a mobile lift at the door if no other means of disembarking is available. A monitoring system tracking all use of lifts and recording the amount of time taken to board or leave the train and any problems encountered shall be established.

28. The MBTA shall include one low-floor Type 8 Breda car in each train set or consist on the Green Line, to the extent such cars are actually available for service, following completion of any work necessary to enable Type 8 cars to run on each branch. All work necessary to enable Type 8 cars to operate on the D and E branches shall be completed as soon as possible.

29. The MBTA shall ensure that there is a timely and effective response to any access-related emergencies or problems which arise while passengers are using train services. The MBTA shall develop procedures for evacuation of persons with disabilities in the event of an emergency.

30. In the event that the automated announcement system aboard a rail vehicle is not operating, or in the event that one is not installed, rail crewmembers will be required to make manual announcements, with a PA system if installed or by speaking in a loud, clear voice if there is not a PA on the vehicle.

31. The MBTA shall develop detailed procedures governing the provision of, and shall provide, alternative transportation services for passengers forced to detour because of failure of any piece of accessibility related equipment aboard any rail vehicle or at any rail station which results in the inaccessibility of an otherwise accessible station accordance with the requirements of 49 C.F.R. § 37.161(b).

32. All accessibility equipment and devices on trains must be maintained in operable condition. This includes regular preventative maintenance programs, daily checks, signage checks, prompt repair of equipment failures, the stocking of a reasonable supply of repair parts and maintaining a comprehensive maintenance record keeping system.

**Stop Announcements**

33. Pending the introduction of automated stop announcement devices, bus drivers and train operators will announce stops at transfer points with other fixed routes, major intersections, approaching train stations, the name of the station when the train is standing, destination points and at intervals along routes sufficient to enable passengers with visual impairments and other disabilities to be oriented to their location. The route number and destination of

- 12 -

buses must be announced at stops serving more than one route. Stop announcements should include the names of commonly known landmarks near stops wherever practical. Stop announcements shall also be made for any stop at the request of an individual with a disability.

34. The MBTA shall develop a standardized list of all fixed, required announcement points for all bus routes within the system, and shall use this list in the training of bus operators and the monitoring stop announcement compliance. The list shall be developed in consultation with the plaintiffs and shall be reviewed and revised on a biannual basis or more often as needed, and coordinated with the MBTA's biannual service plan update. The list shall be revised each time an individual route changes its routing and the MBTA should include key landmarks and new developments, such as post offices and shopping centers, in the stop announcements along each route wherever practical.

35. Operators who fail to comply with stop announcement policy shall be periodically retested to determine if they are complying with the policy. MBTA disciplinary policy must be applied consistently to operators who fail to comply with the stop announcement policy.

36. In all cases in which an automated announcing system has been installed in a vehicle, the MBTA shall develop procedures to ensure that the device is operational and properly configured for all routes a bus will be operating on for that service day and shall ensure that the enunciator is set to make announcements with sufficient volume that they can be heard throughout the bus, regardless of the ambient noise within the bus, and that the announcements can be heard by passengers standing outside on the curb, waiting for the bus.

37. In the event that an installed automatic stop enunciator is not working, the MBTA shall ensure that bus operators manually make all required announcements using the installed

public address (PA) system or, if the PA system is not working, in a loud voice that can be heard throughout the bus and outside of the bus on the curb when the entrance doors are opened.

38. The MBTA shall ensure that PA systems onboard vehicles are interoperable with all new visual display systems such that the auditory announcement is simultaneously displayed visually.

39. The MBTA shall continue its Stop Announcement Monitoring Program (SAMP) even when all buses are fully automated. The program shall continuously monitor both buses and the MBTA's rail services to ensure equipment is working properly and the MBTA staff makes the appropriate announcements when requested and when automated equipment is not working.

**Station Management**

40. New and key stations (as defined by the ADA regulations) must be managed and maintained in a manner that makes them readily accessible and usable by persons with disabilities.

41. Stations must be maintained in clean condition, well lighted and free of debris or material that in any way creates barriers or safety hazards for persons with disabilities. Any maintenance program shall address defects in walking surfaces, ramps, stairs and escalators, handrails, stair treads, doors and lighting;.

42. Train platform edges which are not protected by guard rails shall have detectable warnings that are maintained in safe condition to the extent required by applicable ADA regulations. The MBTA will perform repairs to correct defects in detectable warnings in accordance with the schedule in Addendum B.

43. The MBTA shall ensure that there is a timely and effective response to any access-related

- 14 -

emergencies or problems which arise while passengers are using its stations.

44. The MBTA shall ensure that  appropriate MBTA personnel are available in order to assist all
passengers with access.

## Communications with Passengers

45. The MBTA shall develop and implement an improved and standardized system for signage,
wayfinding and navigation in MBTA stations that will enable passengers to determine how to
navigate the station.

46. The MBTA will hire a nationally known "wayfinding" expert or firm with documented
experience with creating effective wayfinding systems and graphic standards for users,
including people with disabilities and older people by September 30, 2006 to conduct an
evaluation of the existing navigation systems in all stations. The scope of work for the
evaluation shall include the items contained in Addendum B.

47. The MBTA shall adopt and implement all reasonable recommendations of the expert hired
under paragraph 46 unless it can clearly demonstrate that a particular recommendation would
create an undue financial burden in relation to the MBTA operating and capital budgets
considered in their entirety or that a particular recommendation would not result in an
improvement to the navigation, signage and wayfinding systems in MBTA stations.

48. Within 90 days after the effective date of this agreement, the MBTA shall designate a person
on staff whose primary responsibility is "navigation and wayfinding".  The staff person
should have an architectural background. The staff member will have direct responsibility for
ensuring compliance with paragraph 45 of this agreement.

49. The new public address (PA) systems being installed in MBTA stations shall adjust to
ambient noise levels and be interoperable with all new visual display systems such that the

auditory announcement is simultaneously displayed visually. The MBTA will replace existing PA systems to meet these requirements.

50. The VMS equipment being installed in MBTA stations shall display visual announcements similar in content and clarity to auditory announcements where public address systems exist or are installed in the future, shall be installed on train platforms so that, to the maximum extent feasible, messages are displayed perpendicular to the right of way or not blocked by objects or vehicles, and equipment displaying next train information in station lobbies shall be located in prominent locations visible to all riders as they reach or pass through fare gates. The MBTA will replace existing systems to meet the above requirements.

51. The MBTA shall ensure that emergency call boxes (ECBs) are maintained in proper working order and are designed to be usable by people with disabilities.

52. The MBTA must provide at least one public TTY phone in working condition at each station that has a public pay phone. Customer service numbers shall be clearly posted at each public phone, in Braille and raised letters.

**Elevators**

53. The parties recognize that elevators are critical station access features and are used by thousands of riders daily. For riders with more severe hidden disabilities or who use mobility devices, elevators represent the only way to access many MBTA stations and accompanying transportation lines. For many other MBTA riders, elevators make it possible to use the MBTA system easily and safely. As such, the MBTA recognizes the importance of and need for reliable elevators and agrees to the following: Elevators must be maintained and operated in a manner that makes them readily accessible and usable by persons with disabilities at all times during passenger service hours, which includes maintaining them in clean and safe

- 16 -

condition. To accomplish the goal of providing readily accessible and usable elevator service the MBTA must design, fund and implement an elevator management plan to provide continuous, uninterrupted elevator service during all passenger service hours, subject only to temporary and isolated elevator outages for repairs, maintenance and inspections. Service interruptions for preventive maintenance and inspections shall be scheduled in a manner to minimize the impact of any gaps in service and shall only occur when alternative accessible transportation is available to passengers needing to use elevators. The MBTA shall provide adequate funding for all aspects of elevator operations, including all maintenance, to achieve the goal of continuous uninterrupted service as set forth in this paragraph. The MBTA shall provide sufficient management oversight to achieve the goal of continuous uninterrupted service as set forth in this paragraph.

54. The MBTA shall be considered out of compliance with the obligations set forth in the preceding paragraph if, during any one month period, the number or duration of outages for any elevator in the MBTA passenger service system is more than insubstantial. If the independent monitor appointed pursuant to paragraph 89 determines that the MBTA is out of compliance with this requirement the MBTA shall, within 30 days, develop a corrective action plan to address the performance problems of the elevator or elevators found to be out of compliance and shall implement such plan promptly. If plaintiffs seek enforcement of the preceding paragraph by the Court, the MBTA shall have the burden of establishing that it has designed, funded and implemented an elevator management plan to provide continuous, uninterrupted elevator service during all passenger service hours, subject only to temporary and isolated elevator outages for repairs, maintenance and inspections.

55. The MBTA agrees to install the following new/redundant elevators:

- 17 -

a. Porter Square: two additional elevators at the Porter Square station, one from the street level to the fare lobby and one from the fare lobby to the subway platform

b. Harvard Square: one additional elevator in the Brattle Square area of the Harvard Square station;

c. Park Street: one additional elevator at the Park Street station between the surface and the Green Line westbound platform, and an additional elevator between the center Red Line platform and the Green Line westbound platform at Park Street station. If it is not feasible to install an elevator on the center Red Line platform at Park Street, elevators shall be installed on each of the two Red Line side platforms connecting to the Green Line westbound platform;

d. Downtown Crossing: additional elevators at Downtown Crossing station connecting the southbound and northbound Red Line platforms to the southbound (Forest Hills) Orange Line platform

56. The MBTA will replace the following elevators:

a. Central Square: replace elevator 861 at Central Square station;

b. Porter Square: replace elevators 818 and 820

c. Park Street: replace elevators 804 and 808

d. Harvard Square: replace elevator 821

e. State Street: replace elevator 802

57. The MBTA shall make best efforts to secure any approval required from any governmental entity to replace or install any of the elevators described in paragraphs 55 to 56. If any non-governmental entity or individual seeks to block approval for the replacement or installation of any of the elevators described in this paragraph, through litigation or otherwise, the

- 18 -

MBTA shall make best efforts to oppose such action, including undertaking any necessary litigation to the extent that the MBTA believes that reasonable grounds exist for such litigation. The plaintiffs will support the MBTA in all efforts to obtain approval for replacement and installation of the elevators described in this paragraph, including assisting in and joining in any litigation that the MBTA engages in. If approval to install any particular elevator is denied, the MBTA shall discuss with the plaintiffs the feasibility of seeking approval for installing the elevator in another location of the station for which approval was denied. The MBTA is not required to engage in any litigation against any governmental entity under the terms of this paragraph.

58. In addition to any force majeure language in this agreement, the parties acknowledge that both new and replacement elevators require approvals that are beyond the authority of the MBTA. In order to promote station accessibility, the parties agree that, where a station will have both a new/redundant elevator and a replacement elevator as per this agreement; the MBTA will prioritize the completion of the new/redundant elevators prior to replacing existing elevators. To meet this goal, the MBTA will immediately take the necessary steps to hire a consultant to design the new/redundant elevators and agrees to advertise each elevator for construction within 30 days of completing design and obtaining all necessary approvals to permit construction of the new/redundant elevator. The MBTA will hire a design firm by July 13, 2006 and anticipates completing of the design of the elevators within one year from that date. The parties acknowledge that design for some of the elevators may be quicker or slower than others. In the event that design cannot be completed for any new/redundant elevator due to issues surrounding obtaining the requisite approvals, such as public processes controlled by other agencies/parties or litigation, or due to legitimate engineering reasons, the

MBTA will meet with the plaintiffs to discuss the feasibility of installing the new/redundant elevator in another location of the station or whether the MBTA should move forward with a replacement elevator instead of seeking to install the new/redundant elevator in another location of the station. The MBTA has commenced the design of the replacement elevators and will expedite their completion such that the replacement can be (1) substituted in time for the new/redundant as per this section or (2) completed as soon as practicable after the completion of the new/redundant elevator. The purpose of this provision is to ensure that the parties have the ability to reconfigure the schedule of these commitments based on the ability to secure approvals.

59. The MBTA shall consult with the plaintiffs for the purpose of discussing which existing MBTA elevators need to be replaced or modified and which stations need additional elevators. The plaintiffs and the MBTA shall review each station starting with the group including New England Medical Center, Chinatown, Oak Grove and South Station to determine which, if any, of the existing elevators in this group of stations needs to be replaced, enlarged and/or upgraded and the specifications for any such changes and to determine whether any additional elevators need to be installed in any of these stations and the specifications for such additional elevators.

60. The MBTA shall: (a) allocate a total of $122,000,000 in capital investment funds during fiscal years 2007 through 2011 for replacement, rehabilitation, upgrading and/or installation of additional elevators and escalators in stations in use as of the date of this agreement; and (b) award construction contracts and take any other steps necessary to spend the $122,000,000 amount. The allocation of funds and commitment to award contracts in this

paragraph does not preclude either the MBTA or the plaintiffs from seeking additional capital funds for elevators and escalators during fiscal years 2007 through 2011.

61. Information advising consumers when elevators are out of service, including when preventive maintenance is being performed, must be provided in a timely and accessible manner. When elevators are closed for preventative maintenance, the elevator must be listed as out of service. Chief Inspectors and Inspectors must ensure that elevator In/Out of service signs are locked. The recorded announcement system and web posting of elevator outages must be consistently synchronized and must indicate clearly what the operational impact of such outages would be (e.g. "passengers will be unable to get from the street to the outbound platform," "Red Line passengers may transfer between inbound and outbound platforms but cannot reach the street level," or, "passengers arriving inbound on the orange line will be unable to transfer to the blue line," etc.). Announcements must be updated every two hours or whenever there is a change in the status of an elevator.

62. The MBTA must develop and operate a system for distributing information regarding elevator outages so that it is available to passengers at all train stations and so that announcements regarding elevator outages are made in a manner which enables passengers to use alternate routes.

63. The MBTA must also develop and operate a system for distributing information regarding elevator outages at MBTA stations requiring passengers with disabilities to use private, non-MBTA elevators in order to exit to street level from a concourse.

64. A sign system at the station street entrance and at each platform must advise passengers of their ability to actually access the street or platform.

65. The MBTA must post information about elevator and escalator outages at all station entrances. The notice must include the location of the elevator or escalator that is out of service and must advise passengers how to get assistance in getting to their intended destinations. The plaintiffs and the MBTA will continue to discuss the most effective means of providing notice of outages at stations entrances including use of large print signs.

66. Within 90 days after the effective date of this agreement, the MBTA shall develop a policy and procedure regarding alternative service routing during elevator outages. Whenever there is an outage the MBTA shall advise passengers of the least inconvenient alternative means of reaching their destinations, and provide passengers with instructions, fare media or immediate response alternative paratransit service when necessary. Passengers shall not be charged for this alternative service. The procedures governing this type of situation should be publicized and made available to the public. Services established for elevator outages must also be posted on the MBTA website and included in the recorded elevator announcement.

67. Should the MBTA continue to use a contractor to manage and maintain elevators and escalators, the agency shall develop a contractor oversight program that shall include a standard set of monthly operating and reliability reports, as well as the results of random and surprise physical inspections of elevators, elevator equipment rooms and escalators and their machine spaces. Such physical inspections shall be conducted on at least 5% of the system's passenger vertical access equipment per month.

68. Should the MBTA choose to manage elevator and escalator maintenance "within house," the agency shall establish a unit of staff, which is independent of the staff managing vertical access equipment, and which shall perform the inspections described in paragraph 67 above.

- 22 -

**Design**

69. The MBTA will commit to the update of the comprehensive "Guide to Access" and will incorporate the guide into future standards. This guide will reflect the MBTA's commitment to a safe, reliable, and easy to use system that welcomes all riders regardless of ability and age.

**Access to Vehicles and Facilities**

70. The MBTA must develop and implement a plan for collaborating with any governmental or private entities for the purpose of ensuring access to MBTA vehicles and facilities by persons with disabilities. The collaboration plan must specifically address issues of snow removal, removal of illegally parked vehicles at bus stops, signage on public right of ways, sidewalk accessibility and curb cuts, road repairs and other activities likely to have an adverse affect on accessibility. The plan shall include provisions to:

    a. ticket and tow all vehicles stopped in bus stops and develop an enforcement plan to effectuate this policy and report annually on its efforts;

    b. in conjunction with the towns and cities in which the MBTA operates, develop a plan and processes to ensure that bus stops are unobstructed by snow at all times;

    c. in conjunction with the towns and cities in which the MBTA operates, develop a plan encourage towns and cities to mark all bus stops with signage at the beginning and end of each stop and on a bi-annual or more frequent basis as needed, paint the pavement adjacent to and the curbs at, bus stops in a reflective yellow or other visible color and label the pavement as a tow zone.

    d.  where there are documented or persistent problems with buses not pulling to the

         curb because of difficulty reentering travel lanes or vehicles blocking bus stops or

         their approaches, the MBTA shall provide heightened enforcement and or with

         the approval of local municipalities and or state agencies, install partial or

         complete curb extensions/bulb-outs.

**Customer Assistance**

71. The MBTA must establish and operate a system to provide assistance to customers with

disabilities. Customer assistance services must be available at all stations on the fixed route

system. Customer assistance services must include a means of providing help with boarding

or leaving trains and buses, using accessibility features, arranging for alternative

transportation when necessary, and other assistance to facilitate use of the system by persons

with disabilities. The MBTA must ensure that customer assistance services are available to

persons with disabilities during all hours of operation.

**Alternative Transportation**

72. The MBTA must provide alternative transportation to persons with disabilities when the

fixed route system is not readily accessible or usable, in accordance with applicable ADA

regulations. The system for providing alternative transportation must be designed and

managed in a manner that ensures that customers are promptly advised of their right to

alternative transportation, that the need for such services is promptly communicated to the

responsible officials, and that services are provided in a timely manner.

73. The MBTA must have vehicles suitable for providing alternative transportation for persons

with disabilities immediately available whenever there is a need to provide alternative

transportation.

74. In any case where there is a planned or evident long-term situation when the fixed route system is not readily accessible or usable, the MBTA must establish, publicize and provide a dedicated ready means of alternative transportation to mitigate such an interruption.

## Complaints

75. The MBTA must maintain the system for receiving complaints and providing prompt responses and, where complaints are found to be valid, effective remedies for persons with disabilities who do not receive adequate service. Within 90 days after the effective date of this agreement, the MBTA must complete a review of effectiveness of the existing complaint system and propose a plan for correcting any deficiencies. Following the internal review the MBTA will submit the complaint system, whether revised on not, for review and comment by the plaintiffs.

## Personnel

76. Within 90 days after the effective date of this agreement, the MBTA must revise its training programs in the following ways:

    a. ADA compliance training for all managers and staff must be fully integrated into the regular training programs.

    b. Bus operator training relating to the ADA must be fully incorporated into the standard program and provided by the training department.

    c. All bus operators and transportation personnel must receive a refresher-training course concerning ADA requirements.

    d. Enhanced training programs regarding ADA compliance and accessibility must be developed for managers, supervisors and staff with direct contact with customers.

e. Customer assistance training and sensitivity training must be added to the bus operator, train operator and station employee curriculum.

f. Modules addressing disability awareness, customer assistance and sensitivity training must be added to the curriculum.

g. A test measuring driver knowledge must be implemented, documenting that all operators have been "trained to proficiency" as required by the regulations.

h. The pre-trip inspection (circle check) training must be enhanced to emphasize the checking of all accessible equipment, not just lifts.

i. The road observation program must be modified to include planned observations of drivers providing accessible service.

j. Training for bus operators and other transportation personnel must include direct work with individuals with disabilities including individuals with mobility, vision and hearing impairments and further including individuals who use wheelchairs, scooters, canes and other mobility devices.

77. The MBTA shall review and revise its entire training program as it relates to service to individuals with disabilities in consultation with the plaintiffs and their representatives. Such consultations shall take place within 120 days after the effective date of this agreement and shall continue on an ongoing basis as needed.

78. All staff coming in direct contact with customers must be supervised to ensure persons with disabilities receive proper service.

79. Available disciplinary procedures must be used to ensure accountability for performance of job responsibilities related to accessibility and ADA compliance. Such a system shall be comparable to that used for non-ADA rules infractions. Each instance of use of disciplinary

procedures regarding access and ADA compliance must be recorded in a central register and reports on actions taken must be provided to senior managers on a regular basis.

**Management**

80. The MBTA shall design management systems and plans to ensure compliance with all aspects of this agreement, shall provide sufficient funding for all equipment, facilities, personnel and activities necessary to ensure compliance with all aspects of this agreement and shall fully implement all plans, programs and activities necessary to comply with this agreement. The MBTA shall prepare a detailed written description of the management systems and plans required by this paragraph, a detailed written budget specifying the funding available to meet the requirements of this paragraph and a detailed written description of actions to be taken implement all plans, programs and activities as required by this paragraph. The written descriptions and the budget required by the preceding sentence shall be submitted to the monitor appointed under paragraph 89 and the plaintiffs for review and comment with 90 days after the effective date of this agreement. Such written descriptions and the budget shall revised every six months and submitted to the monitor and plaintiffs for further review.

81. The MBTA shall establish the position of Assistant General Manager for System Accessibility. This individual shall report directly to the General Manager and shall be responsible for assisting the General Manager to ensure compliance with this settlement and coordination of the implementation of its various components; for developing further means to improve accessibility to MBTA services compatible with this settlement and state and federal law; and to ensure that all departments and components of the MBTA, as part of their regular duties and responsibilities, understand and comply with all disability access

- 27 -

requirements as mandated by this settlement, state and federal law, and any other
accessibility policies and programs established by the MBTA.

82. The MBTA shall develop an internal management and reporting system to ensure that all
ADA and accessibility related performance and policy issues are brought to the attention of
senior operations managers, the Chief Operating Officer and the General Manager of the
organization.

83. The plaintiffs may make proposals to the MBTA concerning: (a) the design of future new
low-floor buses (*see* paragraph 9); (b) the issue of platform gaps (*see* paragraph 24); (c) the
addition, replacement, or modification of elevators (*see* paragraph 59); (d) the posting of
information about elevator and escalator outages (*see* paragraph 65); and (e) MBTA training
programs regarding service to individuals with disabilities (*see* paragraph 77). The MBTA
shall adopt any proposal made by the plaintiffs concerning any of these items (a)-(e) that is
reasonable, taking into consideration the cost, feasibility, benefits, and consistency of the
proposal with MBTA policies, unless the MBTA has a reasonable basis for rejecting the
proposal, in which case the MBTA must send the plaintiffs a letter explaining the MBTA's
basis for rejecting the proposal.

84. The MBTA shall meet with the plaintiffs to discuss adoption of standards for elevators. Such
discussion shall include consideration of the items listed under the heading "Elevators" on
Addendum B.

**Marketing, Outreach and Public Relations**

85. The MBTA must conduct a comprehensive marketing study to determine the extent of need
for accessible services. The marketing study must include a component that seeks to

- 28 -

determine why persons with disabilities who could use the fixed route system choose to use the Ride or choose to forgo using any MBTA services.

86. The MBTA must conduct a marketing campaign to educate customers with disabilities about all existing MBTA accessibility services. The marketing campaign must have a component to encourage greater use of the fixed route system by people with disabilities.

87. The MBTA must work in collaboration with organizations representing and providing services to persons with disabilities to encourage greater use of the fixed route system.

88. The MBTA must develop and conduct a public relations program to educate all customers about its plans for providing services to persons with disabilities. The public relations program must include a component for encouraging public awareness in providing accessible services to persons with disabilities.

**Independent Monitor**

89. An independent monitor shall be appointed to assess compliance with this agreement. In addition to any powers explicitly set forth in this agreement, the monitor shall assess compliance by the MBTA with all aspects of this agreement and issue findings on a quarterly basis. The first compliance assessment and report of findings shall be completed within six months after the effective date of this agreement. Such findings shall include a determination whether the MBTA is in substantial compliance, partial compliance or out of compliance with the various requirements and shall indicate the general trend of improvement or degradation of compliance in each area monitored. In discharging his/her responsibilities the monitor shall serve as a resource to the MBTA and its staff to improve accessibility and customer service, comment on and be able to recommend possible solutions to access problems, and will inform the MBTA of access problems or conditions which negatively

affect passenger travel. The monitor shall serve as long as the Court retains jurisdiction (see paragraph 99, below).

90. The monitor will be selected by agreement of the parties. In the absence of agreement the monitor will be selected by the Court from a group of candidates proposed by each party. The monitor will be appointed by and accountable to the Court.

91. The monitor shall employ testers and observers to assess compliance with the provisions of this agreement, including particularly paragraph 1. Testers shall include persons with disabilities. The MBTA, the plaintiffs, and the monitor shall mutually develop a valid and reliable sampling program that uses anonymous testers with disabilities to determine the MBTA's rate of compliance with the provisions of this agreement. The sampling program shall include a component that uses comparable methodology to that used by Delta Services Group, Inc. and the Social Research Corporation in the bus system accessibility study done for the plaintiffs, as described in the report of August, 2005.

92. The MBTA shall provide the monitor with sufficient information, in a suitable format, and access to MBTA facilities and personnel to enable the monitor to discharge any duties under this agreement. The MBTA shall provide, at a minimum, the materials as listed in Addendum C on a regular basis. All information provided to the monitor shall also be provided to the plaintiffs.

93. All reports prepared by the monitor shall be provided to the plaintiffs.

94. The monitor shall conduct public meetings every six months during the time when this agreement is in effect to report on his/her activities and on progress in implementing the provisions of this agreement.

- 30 -

95. The MBTA shall pay for all expenses related to the performance of the monitoring function up to a maximum of $300,000 per year. The reasonableness of the expenses related to monitoring shall be subject to review by the Court.

## Communication Between the Parties

96. The parties will endeavor to maintain open communications regarding all aspects of implementation of this agreement. During the first year of implementation the parties will meet monthly to review progress and discuss any matter of concern to either party. After the first year the parties will meet at least 6 times a year and more often if either party requests a meeting. The parties will inform the each other of any problems or issues concerning the implementation of this agreement at the earliest opportunity. The MBTA will provide the plaintiffs with all information given to the independent monitor and will provide information in response to any reasonable requests related to implementation of this agreement. The MBTA will provide the plaintiffs with reasonable access to personnel and facilities as needed for the implementation of this agreement.

## Attorneys' Fees, Litigation Expenses and Costs

97. The MBTA shall pay the plaintiffs reasonable attorneys' fees, litigation expenses and costs for work done through March 9, 2006. The plaintiffs' attorneys may seek additional attorneys' fees, litigation expenses and costs for work done implementing and enforcing this agreement.

## Duration

98. The parties recognize that the MBTA's principal obligations to ensure accessibility are established by law. In addition, the particular obligations established by this agreement will remain in effect until: (a) the expiration of a period of five years after the effective date of

- 31 -

this agreement (the "five-year period") and the issuance, after expiration of the five-year period, of three consecutive quarterly reports by the monitor finding the MBTA in substantial compliance with each term of this agreement; (b) agreement of the parties that the conditions sought by the agreement have been satisfied; or (c) order of the Court upon the application of one or more of the parties.

**Jurisdiction of Court**

99. The Court shall retain jurisdiction to enforce the terms of this agreement so long as it remains in effect under paragraph 98, above.

**Dispute Resolution**

100.   Any dispute concerning interpretation, implementation, compliance assessments by the monitor and/or compliance with this agreement shall be resolved as follows: (a) the party initiating the dispute resolution process shall notify the other party in writing of the nature of the dispute and shall provide a reasonable explanation of the factual and legal basis for the party's position; (b) within thirty days of the notice of dispute counsel for the parties shall confer to attempt to resolve the matter; (c) if counsel are unable to resolve the dispute, the MBTA and the plaintiffs shall meet in an effort to resolve the matter within 30 days of the date on which counsel concur that they cannot resolve the dispute; and (d) if the parties are unable to resolve the dispute they will request that the Court refer the matter to a Magistrate Judge for mediation; and (e), if the dispute has still not been resolved, counsel for the parties will submit the matter to the Court for formal resolution.

**Force Majeure**

101.   The MBTA shall not be liable for failure to perform any obligation under this agreement, and any such failure shall not be considered a breach of or non-compliance with any term of

- 32 -

this agreement, if such failure results from any act of God, riot, war, civil unrest, flood, earthquake, third party not subject to the MBTA's control, or other causes beyond the MBTA's reasonable control.

**Release**

102.    Plaintiffs, individually and for and on behalf of all persons with mobility, vision and hearing disabilities, fully, finally and forever release, relinquish, discharge, and waive any and all accessibility and accessibility-related claims for injunctive and declaratory relief concerning MBTA fixed route bus and subway systems which they now have or may have ever had against the MBTA, its officers, board members, employees, attorneys, and agents, arising out of any act, omission, or occurrence, from the beginning of the world until the effective date of this agreement, including without limitation any and all claims for injunctive or declaratory relief arising out of or relating to the facts, transactions, occurrences or subject matter described in the Amended Complaint filed in the Lawsuit, and all claims under 42 U.S.C. § 12131 et seq. (the Americans with Disabilities Act), 29 U.S.C. § 794 (the Rehabilitation Act), or any other federal or state law that addresses the accessibility of fixed route bus and subway systems for individuals with mobility, vision or hearing disabilities.

**Entire Agreement**

103.    This agreement contains all the agreements, conditions, promises and covenants among the MBTA, Plaintiffs, and their respective counsel regarding matters set forth in it and supersedes all prior or contemporaneous agreements, drafts, representations or understandings, either written or oral, with respect to the subject matter of the present agreement.

**Court Approval Process**

104. The obligations in this settlement agreement will become effective 45 days after the entry of final judgment dismissing this action if a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or a notice of appeal challenging this settlement agreement has not been filed or, if a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or a notice of appeal challenging this settlement agreement has been filed, within 45 days after all appellate proceedings pertaining to this settlement agreement have been completed and this settlement agreement has been determined to be valid and binding. References in this settlement agreement to "the effective date of this agreement" should be construed to refer to the terms of this paragraph.

105. Promptly after the execution of this settlement agreement, the parties shall jointly move the Court for preliminary approval of this settlement agreement. The motion shall include a copy of the settlement agreement and request that the Court: (a) approve a draft notice of settlement, a draft summary notice, and a proposed order granting preliminary approval to be attached to the motion; (b) approve mailing notice of the settlement to advocacy and service organizations working with people with disabilities in the MBTA's service area identified by the plaintiffs and the MBTA and the publication of a summary notice in the *Boston Globe* and the *Boston Herald* within 10 days after the entry of an order granting preliminary approval; and, (c) set a date for a fairness hearing which is no less than 45 days, and no more than 60 days, after the entry of the order granting preliminary approval of this agreement.

The order of preliminary approval shall require, and the notice of settlement and summary notice shall set out, that any class member (other than named class representatives) may object to this settlement agreement by mailing a written objection to the Court and

- 34 -

plaintiffs' counsel at least 10 days before the fairness hearing. The order of preliminary approval shall also require, and the notice of settlement and summary notice shall also set out, that any class member who does not object in this manner shall be deemed to have waived his/her/its objections.

Plaintiffs' counsel shall maintain copies of any objections to this settlement agreement and, no more than five days after receipt, shall provide copies of such objections to counsel for the MBTA. The notice of settlement and the summary notice shall set out the mailing address plaintiffs' counsel. Plaintiffs' counsel shall maintain a telephone number which may be called during normal business hours by any class member who has questions about this settlement agreement. The notice of settlement and the summary notice shall set out this telephone number and state that class members with questions about this settlement agreement may call the number during normal business hours.

106.  The order of preliminary approval shall, at a minimum, contain provisions regarding each requirement contained in paragraph 105 and:

   a.  a provision preliminarily approving this settlement agreement and, subject to any objections that might be made in the manner described above, finding that the settlement agreement is fair, adequate, reasonable, and in the best interests of plaintiffs;

   b.  a provision finding that the notice of settlement and summary notice described above, or such other notice as the Court determines necessary, constitutes valid, due, and sufficient notice to the class and the best notice practicable under the circumstances, complying fully with the requirements of the Federal Rules of Civil Procedure, the Constitution of the United States, and any other applicable law; and,

- 35 -

c. a provision providing that class members or any other person with standing may appear at
the fairness hearing and object to judicial approval of this settlement agreement, provided
that any objectors shall have complied with the procedure for objections set out in the
notice of settlement and the summary notice.

107. The parties agree to take such actions as are reasonably necessary to obtain final approval
of this settlement agreement by the Court including, but not limited to, filing memoranda in
opposition to any objections to this settlement agreement.

108. At the fairness hearing, the parties shall jointly submit to the Court and request entry of a
final judgment that includes, at a minimum, provisions stating that:

a. the form and method of notice given to the class complied with the requirements of Rule
23 of the Federal Rules of Civil Procedure, satisfied the requirements of due process, is
the best notice practicable under the circumstances, and constitutes due and sufficient
notice of the settlement agreement, the fairness hearing, and other matters referred to in
the notice to all persons entitled to receive such notice;

b. the Court has held a hearing to consider the fairness, reasonableness and adequacy of the
proposed settlement;

c. arm's-length negotiations have taken place in good faith between class counsel and
MBTA counsel, and have resulted in the settlement agreement;

d. the settlement agreement is hereby finally approved pursuant to Fed. R. Civ. P. 23(e) as
fair, reasonable and adequate, and the settlement agreement shall be consummated in
accordance with its terms and provisions;

e. the class members in this case include all individuals with mobility, hearing, or visual
disabilities, a defined by Title II of the Americans with Disabilities Act, 42 U.S.C. §
12131(2), who use, will use, or would use the bus, light rail, and heavy rail rapid transit
services operated by the MBTA who are, or will in the future be, denied equal use of
these services because the services are not readily accessible to and usable by individuals
with such disabilities;

f. the class members, all and each of them (including plaintiffs), are hereby bound by the
terms of the settlement agreement;

g. in approving the settlement agreement, the Court has considered: (1) whether the
proposed settlement was fairly and honestly negotiated; (2) whether serious questions of

law and fact exist, placing the ultimate outcome of the litigation in doubt; (3) whether the
value of the proposed settlement outweighs the mere possibility of future relief after
protracted and expensive litigation; and (4) the judgment of the parties that the proposed
settlement is fair and reasonable;

h.  this class action is complex with many intricate factual and legal issues and the results of
    litigation, including this one, can never be predicted with complete accuracy;

i.  the judgment of class counsel is that the proposed settlement is fair, reasonable and
    adequate;

j.  the class members are deemed to have released and forever discharged the MBTA with
    respect to the claims that are released in paragraph 102 in the settlement agreement,
    which is incorporated by reference herein and attached hereto;

k.  the class members are hereby permanently barred and enjoined from instituting or
    prosecuting, either directly, representatively, derivatively or in any other capacity, any
    action against the MBTA asserting any of the claims released by them in this settlement
    agreement;

l.  the Court, without affecting the finality of this Order for Final Judgment, hereby retains
    and reserves jurisdiction over implementation and performance of the settlement
    agreement pursuant to paragraph 99 of the settlement agreement; and

m.  the Court orders the entry of final judgment dismissing this case with prejudice and
    without costs.

## Miscellaneous

109.    The parties hereto waive any right to appeal or collaterally attack the final judgment

approving this settlement agreement.

110.    The parties hereto have participated in the drafting of this settlement agreement and,

accordingly, any claimed ambiguity should not be presumptively construed for or against any

of the parties hereto.

111.    This settlement agreement may be signed in counterparts.

**For Plaintiffs:**

Joanne Daniels-Finegold
Plaintiff

Gene Smith
Plaintiff

Madelyn Joan Golden
Plaintiff

Maureen Gradem
Plaintiff

Danford Larkin
Plaintiff

Thomas Gilbert
Plaintiff

Roger Robinson
Plaintiff

Reginald Clark
Plaintiff

Myrnains Cepeda
Plaintiff

Andrew Forman
Plaintiff

Robert Park
Plaintiff

Boston Center for Independent Living
Plaintiff
by William H. Henning, Executive Director

**APPROVED AS TO FORM AND CONTENT:**

Daniel S. Manning
Greater Boston Legal Services
Attorney for Plaintiffs

Todd Kaplan
Greater Boston Legal Services
Attorney for Plaintiffs

Taramattie Doucette
Greater Boston Legal Services
Attorney for Plaintiffs

Anthony A. Bolzan
Dechert, LLP
Attorney for Plaintiffs

- 38 -

**For Defendant MBTA:**

Daniel A. Grabauskas
General Manager
Massachusetts Bay Transportation Authority

**APPROVED AS TO FORM**

William A. Mitchell
General Counsel
Massachusetts Bay Transportation Authority

Dated: April _10_, 2006

## ADDENDUM A

The MBTA shall revise the Bus Operations Rules for Operators and other Employees of Bus Operations (October 1, 2001) as follows:

1. In accordance with 49 CFR § 37.161(a) Rule 72 shall be revised to require inspection of all accessibility equipment and devices.
2. In accordance with 49 CFR § 37.161(c) Rule 80 shall be revised to require that operators report lift failures any time they occur.
3. In accordance with 49 CFR § 37.165(d) Rule 80 shall be revised to specify that the MBTA may not deny transportation to a person using a wheelchair on the grounds that the device cannot be secured or restrained.
4. In accordance with 49 CFR § 37.167(g) Rule 50 shall be revised to specify when and where passengers using lifts can disembark.
5. The MBTA shall adopt a rule, pursuant to 49 CFR § 37.167(e), requiring operators to make use of all accessibility related equipment including kneelers and ramps.
6. The MBTA shall adopt a rule, pursuant to 49 CFR § 37.167(f), requiring operators to provide individuals with disabilities adequate information about transportation services.
7. The MBTA shall adopt a rule, pursuant to 49 CFR § 37.167(i), requiring operators to allow adequate time for individuals with disabilities to complete boarding or disembarking.
8. The MBTA shall adopt a rule, pursuant to 49 CFR § 37.167(j), specifying procedures to be followed by operators to enable individuals with disabilities to obtain seating or occupy a securement area.

Within 60 days after the effective date of this agreement the MBTA shall prepare draft changes as specified for review and comment by the plaintiffs and their representatives. The MBTA shall also meet with the plaintiffs and their representatives within 120 after the effective date of this agreement to review, in their entirety, the Bus Operations Rules for Operators and other Employees of Bus Operations (October 1, 2001), the Subway Operations – Rules for Trainpersons – Heavy Rail July1, 2004, the Rules for Trainpersons – Light Rail (January 1, 2000) and all rules, regulations, general and special orders, or bulletins. One of the topics to be discussed at this meeting is whether the MBTA shall amend Rule 80(d) to make the use of securement devices optional with the passenger and specify the procedures to be used in securing passengers who opt to be secured The MBTA shall adopt any reasonable changes or additions proposed by the plaintiffs that are consistent with MBTA general policies and operating procedures. The MBTA and the plaintiffs shall meet periodically, and no less than once every six months, to review all rules, regulations, general and special orders, or bulletins and make any necessary changes.

40

## ADDENDUM B

## DESIGN STANDARDS AND WORK SCHEDULES

Detectable Warnings

Detectable warnings shall be repaired to meet standards required by ADA regulations as follows:

North Quincy: The MBTA agrees to make best efforts to complete construction of the detectable warning repairs at this station on or before August 31, 2007.

Wood Island, Beachmont, Revere Beach and Wonderland: The MBTA agrees to make best efforts to complete construction of the detectable warning repairs at these stations on or before December 31, 2007.

MBTA shall promptly repair any future defects in detectable warnings as they occur.

The comprehensive review of navigation and wayfinding will include:

a. Review of existing design and signage specifications and graphic standards including but not limited to the materials created and analysis done by Cambridge Seven Associates in 1968 and 2003.
b. Conduct independent interviews with MBTA station staff, the plaintiff and representative members of specific interest groups including people with a range of disabilities, older people, non-English speakers, and professional organizations such as the Boston Society of Architects.
c. review of graphic elements in all stations including recently renovated or constructed stations

In the review of existing standards, evaluation of existing conditions and the development of guidance for a standardized and system-wide navigation and wayfinding plan, the wayfinding expert/firm shall consider:

a. architectural cues and the opportunities to strengthen such cues, as well as ensuring redundancy of cues;
b. development of individual station and platform identities while maintaining a set of common features to all stations;
c. clarification of the Inbound/Outbound designation of platforms;
d. opportunities to strengthen the appropriate and hierarchical display of information on station identity bands, signs perpendicular to the path of travel, and overhead signage;
e. locations where station identity bands are missing, incorrectly installed, misused, or blocked;
f. locations of advertising and or concessions that obstruct sight lines of or interrupt patterns of architectural and signage cues and strategies to prevent future occurrences;
g. reduction of, or improperly located graphic elements in recently renovated or constructed stations

41

h. inconsistent graphic clarity of system maps and line maps including reduced font sizes or changed typefaces;
i. the readability of, system maps, line maps and other materials when printed on surfaces such as vinyl, stainless steel and porcelain as well as when shielded by materials such as glass or plexiglass; and the affects of different lighting sources in creating glare on the objects; and
j. consistency of signage and location of signs throughout the MBTA system.
k. Inclusion and development of navigational aids or cues such as a compass rose embedded in the floor/pavement at major exits of stations and adjacent street names with directional arrows embedded in the pavement outside major exits of stations.

## Elevators

### Doors

The doors shall
a. have a minimum clear opening width of 42";
b. maximize visual transparency from 24" to 72" above the finished floor and across the face of individual door panels utilizing safety glass or other transparent material in a manner that reflects current requirements of state and federal fire and elevator codes;
c. include obstacle sensors at multiple elevations.

### Flooring surfaces

Flooring materials shall be
a. impervious to penetration by liquid or odors;
b. impervious to defacing, damage or destruction by vandals using materials and tools such as acid, blunt objects, or razors;
c. impervious and highly resistant to fire or intense heat, corrosion and rust.
d. preferably of a single piece for the length and width of the interior cab space with molded edges such that the piece is similar in resemblance to a typical shower pan;
e. removable and replaceable in less than a day by repair and maintenance staff;
f. capable of being cleaned or resurfaced at a maintenance shop; and
g. withstand cleaning with industrial cleaners or bleach products at least four times a day.

### Cab design

The cab shall
a. have minimum dimensions of 60 inches x 80 inches such that the longer dimension is perpendicular to the door face and in cases of retrofitting stations with elevators, best efforts should be made for achieving said dimensions;
b. maximize transparency between 24" and 72" above the finished floor utilizing safety glass or other transparent material and the transparent surfaces shall be hung in a manner that allows quick access to adjacent hoistway elements such as hydraulics, seals, wiring, and limit switches and access to both sides of the transparent surfaces for cleaning;

c. have handrails between 33 and 38 inches above the floor on walls without doors that withstand a vertical or horizontal force of 300 pounds, minimum; and where the rail design and installation comply with ADAAG 505.5 through 505.9;

d. wherever possible, have doors on opposites sides of the cab to allow pull-through usage such that the minimum dimension between doors being 72 inches; and

e. provide entry from both ends of the cab at locations where the elevator shaft is free standing on a platform and located near the middle of the platform;

f. in the rare instances where, because of existing non-modifiable physical impediments a cab that must have doors at two right angles (requiring a 90 degree turn to exit) shall have minimum dimensions of 72 inches x 72 inches with doors located as far from each other as possible, and with the accompanying corner space designed to be as transparent as possible.

**Cab controls and buttons and Hall call buttons and Hall lanterns**

Hall call buttons, and lanterns shall

a. segregate service (Low Oil, Service Hold, etc.) and fire related lights and controls some distance from elevator call buttons and shape them in a manner that when read tactily they are not confused for call/control buttons;

b. label button in a standard nomenclature for naming the levels within a station and provide the floor designation in full text off to the side, e.g., Up to Winter Street or Down to Red Line to Alewife or if space is highly constrained, the text may be in a understandable abbreviated form;

c. Identify the position and direction of travel of the elevator cab and;

d. conform to the criteria below;

Control panels shall

a. be located on at least two walls opposite each other such that the controls can be accessed by right and left handed customers without turning;

b. to avoid confusion, segregate service (Low Oil, Service Hold, etc.) and fire related controls and lights some distance from critical buttons;

Critical buttons (floors, door open/close, emergency controls for alarm and intercom) shall

a. be a minimum of 1 1/2" in all dimensions and be separated vertically from other buttons by at least 1 inch.;

b. be located between 35" and 48" above the floor;

All buttons shall

a. be backlit by LED or other long-lasting light sources that are easily replaced;

b. be flush with a frame in such a manner that any individual button cannot be pried out with common tools

c. be made of a material that cannot be cracked, melted or otherwise damaged by lighters or other common objects;

d. be arranged such that in accordance with station layouts, the placement of elevator control buttons on control panels shall be above or below one another corresponding to the relation of the level(s);

e. be activated with minimal force but not be activated by heat sensing technology; and
f. be labeled in a standard nomenclature for naming the levels within a station with the floor designation in full text off to the side, e.g., "Quincy Street" not "QS", "Lobby" not "L", etc.

Button labels shall
a. have characters in accordance with ADAAG 703.2; and the information repeated in Braille in accordance with ADAAG 703.3.

**Interior ceiling components and lighting elements**

Ceiling components and lighting elements shall be
a. located at sufficient height to be difficult to reach easily;
b. difficult to dislodge, insert objects into, or place objects such as trash on top of;

Lighting elements shall
a. be recessed above and around the ceiling elements in a manner that the bulbs are not visible to, or reachable by passengers, but can be quickly replaced (similar to the existing Southwest Corridor elevators);
b. not be covered by plastic shields unless required and if required, the shields must be cleaned on a weekly basis;

**Elevator shafts and headhouses**

Interior elevator shafts shall
a. maximize transparency into the elevator cab;
b. where possible, provide the desirable wayfinding cue of a direct visual connection between levels within stations;
c. be located in prominent, easily seen locations and in a manner that maximizes the visibility of the entrances and exits; and
d. be in the middle of or adjacent to the predominant pedestrian routes, and as near as possible close to the stairs connecting the same levels.

Exterior elevator head houses shall
a. incorporate a substantial overhang with lighting so that customers are sheltered from the elements and in a well-lit area as they wait for the elevator;
b. maximize transparency into the shaft or elevator cab such that the occupants are visible from as many directions as possible;
c. incorporate identity bands, the MBTA T logo, and any other suitable wayfinding cues which are visible from all directions;
d. incorporate call buttons that conform to the above section on Controls and Buttons and a working intercom system;
e. in a consistent location for all headhouses, incorporate above/below the call buttons, the name of the station/platform accessed by the elevator in raised lettering and Braille;
f. in a consistent location, identify the MBTA identification # of the elevator in raised lettering and Braille.

44

**Travel Speed, Automatic cycling, Hold floors, and Door Activation**

a. Travel speeds shall be set such that passengers spend very short periods of time traveling between levels with a minimum speed of 100 ft/minute;

b. Elevators shall be programmed to automatically cycle between floors on a regular basis;

c. Elevators shall be programmed to return to certain floors such that for example, in the morning peak an elevator returns to the lobby to await passengers heading to the platform and in the evening peak it returns to the platform for the same passengers heading home; and

d. To enable hands free operation and decrease vandalism, elevators shall be programmed to upon answering a floor call, then automatically ascend or descend to the levels serviced by the elevator and open the doors;

e. Doors shall remain fully open for a minimum of 3 seconds and at high traffic locations, the time shall be extended on a case by case basis;

f. When doors open, provide an auditory announcement, similar to what WMATA and other systems do, that announces what levels the elevator services such as Orange Line Downtown Crossing Washington and Winter Street elevator. Going down to fare lobby."

**Renovated and rebuilt elevators**

Elevator doors should have the maximum amount of visual transparency feasible under the circumstances

ADDENDUM C

Partial listing of MBTA materials to be provided to the independent monitor.

1.  customer complaints related to MBTA fixed route services;
2.  customer related accident reports;
3.  reports filed with the Federal Transit Administration concerning the operation, maintenance and accessibility of MBTA vehicles, stations, and services;
4.  correspondence, findings and directives from the Federal Transit Administration concerning the operation, maintenance and accessibility of MBTA vehicles, stations, and services;
5.  Stop Announcement Monitoring Program (SAMP) reports;
6.  elevator /escalator/mobile lift outage reports;
7.  bus lift, kneeler and ramp failure and repair reports;
8.  failure and repair reports for and other information concerning the functionality of visual and auditory public address systems on buses, trains, trolleys, and in MBTA facilities;
9.  work updates and reports to the MBTA from Lerch Bates, Kone, and any other firm overseeing, assisting with, or directly maintaining vertical access features in MBTA stations;
10. work updates and reports to the MBTA from Lerch Bates, VTX, and any other firms involved in the renovation, overhaul, replacement, or installation of vertical access features in MBTA stations;
11. engineering reports, architectural studies, plans and specifications for stations or areas of stations to be constructed or about to undergo repair, renovation, rehabilitation or replacement;
12. plans, specifications, and performance criteria for new vehicles, fare equipment, shelters, station amenities, etc.;
13. information about pending maintenance activities at MBTA stations;
14. MBTA reports, annual budget and updates, capital and service plans;
15. ratings, scheduled trip listings, and any other needed materials necessary for undercover monitoring of MBTA services;
16. any other materials the MBTA believes would assist the monitor in its capacity.

ADDENDUM D

MBTA BUS FLEET

PROJECTED AVERAGE FLEET AGE

Fleetingbchart-Rev.12.21