# Exhibit B

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

[stamp] 2002 JUL 25 A 9 57

U.S. DISTRICT COURT

|  |  |
|---|---|
| JANIS HARRIS, MATLYN D. STARKS EILEEN BREWSTER, ROGERA ROBINSON, JOHN ALLEYNE, GENE SMITH, REGINALD CLARK, and LOUISE BEACH individually and as class representatives, | ) ) ) ) ) ) ) |
| Plaintiffs | ) ) |
| vs. | ) ) |
| MASSACHUSETTS BAY TRANSPORTATION AUTHORITY, JAMES H. SCANLON, in his official capacity as Acting Secretary of Transportation and MBTA Chairman, MICHAEL H. MULHERN, in his official capacity as MBTA General Manager | ) ) ) ) ) ) ) ) ) |

## 02<sup>CV</sup>11504 MEL

CIVIL ACTION NO:

<u>COMPLAINT</u>

RECEIPT # 40224
AMOUNT $ 150.00
SUMMONS ISSUED 40
LOCAL RULE 4.1
WAIVER FORM
MCF ISSUED
BY DPTY. CLK. SCS
DATE 7/25/02

## <u>PRELIMINARY STATEMENT</u>

1.     The named plaintiffs bring this action to stop defendants' systemic failure to provide

basic and necessary public transportation services to plaintiffs and other persons with

disabilities.  Each of the individual named plaintiffs is a person with a disability who

needs to use public transportation to travel to work, shop, school,  medical appointments,

community activities, social events and other activities.  All named plaintiffs live within

the geographic area served by the Massachusetts Bay Transportation Authority (MBTA)

and use public transportation provided by the MBTA or would use such public

transportation if it were readily accessible to and usable by persons with disabilities.   On



a persistent and ongoing basis, defendants have discriminated against plaintiffs, because

of their disability, by denying them equal access to public buses and trains, in violation of

Title II of the Americans With Disabilities Act of 1990, 42 U.S.C. §§12131-12163

(ADA) and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (Section 504).

Plaintiffs seek a declaratory judgment and a permanent injunction to require the MBTA

to comply with the ADA and Section 504 by among other things:  making stations

accessible; providing directional signage; providing telecommunications access; a

comprehensive rehabilitation of passenger elevators; preventing bus drivers from failing

to stop for consumers with disabilities, because of their disability;  keeping wheelchair

lifts (lifts) in working condition; deploying lifts in locations appropriate for safe use by a

consumer with a disability; deploying a gap filler on train platforms upon request of a

consumer using a wheelchair; reporting broken lifts or elevators;  providing

transportation for people with disabilities during street renovations/construction;

requiring drivers to announce stops; preventing drivers from being rude or discourteous to

passengers with disabilities because of their disabilities; and taking any other action

required by the ADA and by regulations enacted by the U.S. Department of

Transportation and the Architectural and Transportation Construction Barriers

Compliance Board interpreting the ADA.

## JURISDICTION AND VENUE

2.     This is a civil action authorized by  42 U.S.C. §12133. This court has jurisdiction

pursuant to 28 U.S.C. §§ 1331 because the claims herein arise under federal statutes –the

Americans with Disabilities Act and the Rehabilitation Act of 1973.

3.     Venue is proper in this District pursuant to 28 U.S.C.§1391(b).  All of the events or

2

omissions giving rise to plaintiffs' claims occurred here and the defendants may be found here.

## PARTIES

### PLAINTIFFS

4.    Janis Harris resides in Boston, Suffolk County, Massachusetts. She is an individual with a disability within the meaning of the ADA. Ms. Harris is disabled due to Multiple Sclerosis. She has limited movement of her hands and she is unable to walk. She uses an electric wheelchair or scooter for mobility.

5.    Matlyn Starks resides in Boston, Suffolk County, Massachusetts. She is an individual with a disability within the meaning of the ADA. Ms. Starks is disabled due to Multiple Sclerosis and Bilateral Carpel Tunnel Syndrome. She is unable to walk and uses an electric wheelchair for mobility.

6.    Eileen Brewster resides in Mission Hill, Suffolk County, Massachusetts. She is an individual with a disability within the meaning of the ADA. Ms. Brewster is disabled due to Multi-joint Arthritis and Fibromyalgia. She has limited movement of her hands, arms and legs. She uses an electric wheelchair and a four wheeled walker for mobility.

7.    Rogera Robinson resides in Brighton, Suffolk County, Massachusetts. She is an individual with a disability within the meaning of the ADA. Ms. Robinson suffers from painful arthritis throughout her body. Due to the arthritis in her legs she uses a cane for mobility.

8.    John Alleyne resides in Brockton, Plymouth County, Massachusetts. He is an individual with a disability within the meaning of the ADA. Mr. Alleyne has Multiple Sclerosis and uses an electric wheelchair for mobility.

9.     Gene Smith resides in Dorchester, Suffolk County, Massachusetts. She is an individual with a disability within the meaning of the ADA. Ms. Smith has Multiple Sclerosis and uses an electric scooter for mobility.

10.     Reginald Clark resides in Brookline, Norfolk County, Massachusetts. He is an individual with a disability within the meaning of the ADA in that he is legally blind and uses a white cane for mobility.

11.     Louise Beach resides in Roxbury, Suffolk County, Massachusetts. She is an individual with a disability within the meaning of the ADA in that she is legally blind and uses a white cane for mobility.

## DEFENDANTS

12.     The Massachusetts Bay Transportation Authority (MBTA) is a body politic and corporate and a political subdivision of the Commonwealth of Massachusetts established pursuant to General Laws, Chapter 161A§2, and has a usual place of business in Boston, Massachusetts. The MBTA is a public entity within the meaning of Title II of the ADA, 42 U.S.C. §12131(1) and is subject to the provisions of Subpart B of Title II, 42 U.S.C. §§12141 et seq., in that it provides public transportation services including paratransit, bus, rapid transit, and commuter rail services.

13.     James H. Scanlon, is the Acting Secretary of Transportation and Chairman of the MBTA. In February 2002, he was appointed Acting Secretary of Transportation and Chairman of the MBTA by Governor Jane Swift. He is sued in his official capacity. Mr. Scanlon's principal place of business is at Boston, Massachusetts.

14.     Michael H. Mulhern, is the General Manager of the MBTA. He is sued in his official capacity. Mr. Mulhern's usual place of business is in Boston, Massachusetts.

## THE PLAINTIFF CLASS

15. Plaintiffs bring this suit as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure. The class consists of all individuals with disabilities who use, will use, or would use the transportation services operated by the MBTA who are, or will in the future be, denied equal use of these services because they are not readily accessible to and useable by individuals with disabilities.

16. The plaintiff class is so numerous that joinder of all members is impracticable.

17. There are questions of law and fact common to the plaintiff class including:

  a. whether the defendants' failure to make the MBTA's fixed route bus system readily accessible to and usable by plaintiffs and other persons with disabilities by, among other things: (1) failure to adequately inspect, maintain, and service the mechanical bus lifts, which are needed to allow persons with mobility impairments to board and disembark; (2) failure to adequately inspect, maintain, and service the mechanical bus doors, which are needed to allow persons with mobility impairments to board and disembark; and/or failure to provide ramps needed to allow persons with mobility impairments to board and disembark; (3) failure to adequately inspect and maintain safety equipment used to secure wheelchairs on buses; (4) failure to adequately inspect and maintain belts and straps used to secure people with mobility impairments inside buses; and (5) placing non-accessible buses on purportedly accessible bus lines, violates the ADA and the Rehabilitation Act of 1973;

  b. whether the defendants' failure to make the MBTA's fixed route public

5

train system readily accessible to and usable by plaintiffs and other persons with disabilities by, among other things: (a) failure to keep MBTA station elevators in operating condition; (b) failure to adequately supervise and monitor the cleanliness of MBTA station elevators; (c) failure to respond to calls from riders with disabilities seeking assistance in accessing a train; (d) failure to provide accessible paths of travel within and around the MBTA stations (e) failure to provide adequate and accessible directional signage; (d) failure to provide accessible telecommunications access; and (e) failure to deploy a gap filler upon request violates the ADA and the Rehabilitation Act of 1973;

c.      whether defendants' failure to provide transportation for people with disabilities during street renovations/construction violates the ADA and the Rehabilitation Act of 1973;

d.      whether defendants' failure to adequately train and supervise employees on MBTA buses and trains regarding the proper and safe use of the equipment necessary to provide equal access to persons with disabilities violates the ADA and the Rehabilitation Act of 1973;

e.      whether the defendants' failure to monitor the actions of employees who are disrespectful, discourteous, and unprofessional to people with disabilities, because of their disabilities violates the ADA and the Rehabilitation Act of 1973.

17.     The interests of the class members are typified by the interests of the named plaintiffs because the defendants' practice of noncompliance with accessibility provisions of the

6

ADA which is being challenged, are applicable to each member of the class.

18. The interests of the class will be fairly and adequately protected by the plaintiffs. Attorneys for the plaintiff class are experienced in disability law and have participated in other class actions.

19. The questions of law and fact common to the class, predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this case.

20. The plaintiffs seek certification of a class pursuant to Fed.R.Civ. P.23(b)(2) on the grounds that the defendants' policies and practices deny plaintiffs equal access to public transportation, thereby making injunctive and declaratory relief appropriate.

## STATEMENT OF FACTS
### Allegations of Named Plaintiffs

**Janis Harris**

21. Janis Harris is a 54 year old woman with a disability. She has a dual diagnosis of Multiple Sclerosis and a Spinal Cord injury. She resides independently on Worcester Street, Boston, Massachusetts. Ms. Harris is unable to walk and has limited movement of her hands. She uses an electric wheelchair and a scooter for mobility. Ms. Harris has a drivers license and owns a wheelchair accessible van. She uses her wheelchair accessible van for long trips and to travel to locations not accessible by the MBTA or which are too complicated to get to by MBTA due to the switches required between the various train lines (Green to Orange to Red... ). She purchased the van and got her license because of the extreme frustration and problems she encountered trying to access the MBTA. Still, Ms. Harris must use MBTA buses and trains at least three to four times a week for

7

medical appointments, to visit friends, to get to social events, and to shop.

22. Ms. Harris has been an active Community Advocate since 1994. She is a member of Vivienne S. Thomson Independent Living Center/Minorities with Disabilities Advocacy Center. She attends meetings at the Center, in her neighborhood, and in the surrounding areas, as part of her outreach work with people who have disabilities.

23. Ms. Harris estimates that on any given week, three out of the four times she uses the bus the lift is either broken, malfunctioning or stuck. Some buses do not even have lifts.

24. In January 2002 Ms. Harris wanted to attend a conference at the State House which was scheduled to start at 9:00 a.m. Ms. Harris allowed herself sufficient time to travel by bus. However, she was unable to board the scheduled bus because the lift was broken. After one hour she was able to get on bus with a working lift. She arrived at the meeting at 10:00. On her way home she was able to board a bus however, she was trapped inside the bus because the lift was broken. After waiting for approximately 30 to 45 minutes she was transferred to another bus. Ms. Harris was exhausted and frustrated by the time she arrived home. Ms. Harris' residence is close to the State House, yet she had to spend over an hour and a half traveling this short distance.

25. Ms. Harris encountered buses with broken lifts during her trips to monthly meetings at the Transportation Building (MBTA), in Boston. For example, in July 2001 the bus lift did not work and Ms. Harris arrived late to that month's Transportation meeting.

26. Ms. Harris has encountered bus drivers who do not understand how to operate the lift. In the summer of 1997 she was asked by a bus driver if she had a "key" to the lift on the bus. The driver seemed to think that the lifts were only available to those persons who

had been given a "key" by the MBTA. He told Ms. Harris that he did not have a key and she would have to wait for the next bus.

27. In 1995 through 1996 Ms. Harris filed a civil action against the MBTA for damages she suffered while boarding an MBTA bus. The bus driver let the lift down, Ms. Harris rolled her scooter onto it, and the driver began to raise the lift. However, the driver then closed the lift on Ms. Harris' scooter before securing the scooter or checking to see if she was safe. By closing the lift on her scooter, with Ms. Harris still sitting on it, the driver bent her chair and broke the axle. Ms. Harris was also injured. The MBTA paid Ms. Harris less than 1/8th of the cost required to repair the scooter.

28. Ms. Harris has encountered problems with the gap between the train and the platform. The gap is usually too wide to safely cross and there are no bridge plates to allow a smooth entrance onto or exit off of the trains. The wheels on her electric wheelchair can get stuck in the space between the train and the platform. In 1999 at Downtown Crossing on the Orange line she was stuck in the gap for about 10 to 15 minutes while trying to board the train. Passengers tried to pull her wheelchair onto the train and eventually she was able to get it moving and board the train. Before boarding a train she usually has to start from far back on the platform as possible so that she can get her wheelchair up to a fast enough speed to make it over the large gap. This is dangerous and frightening for Ms. Harris.

29. Ms. Harris has encountered other problems with the MBTA including: bus drivers that are extremely rude and discourteous toward her because of her disability; drivers telling her that the lift is not working and that she must wait for the next bus; and having to wait

9

for a long time to either board a bus or for the MBTA to get someone to come and repair the bus that she is about to board.

30. Not being able to access the buses and trains in a safe way causes Ms. Harris to miss appointments and prevents her from participating in many normal activities such as shopping or visiting friends. This is very stressful for her.

31. Ms. Harris complained at least 10 times verbally to the MBTA about problems accessing the buses. Most of her complaints were to the MBTA complaint line. Once she asked for a copy of her complaint and was told by the person who took her complaint that the MBTA did not give out copies. She has also complained to supervisors, station managers, and even to bus drivers.

**Matlyn D. Starks**

32. Matlyn D. Starks is a woman with disabilities. She has Multiple Sclerosis and other impairments including, Bilateral Carpel Tunnel Syndrome, Asthma and High Blood Pressure. Ms. Starks resides independently on Tremont Street in Boston, Massachusetts. Her impairments prevent her from using her legs and limit the use of her right hand. Ms. Starks uses an electric wheelchair for mobility. Ms. Starks relies on the MBTA's buses and trains daily to get to work, meetings, conferences, medical appointments, shopping, and for social events. She has experienced many problems using public transportation as a result of the defendants' failure to provide accessible services. She has been unable to board or exit buses because of broken lifts. She has been unable to access train platforms, or exit from train stations as a result of broken elevators. She has endured unsanitary elevators containing human feces and urine. Ms. Starks has been subject to bus drivers

10

who are rude and discourteous to her because of her disability.

33. Ms. Starks is the CEO and Executive Director of the Vivienne S. Thomson Independent Living Center/Minorities with Disabilities Advocacy Center (Center). Ms. Starks is either a member of the board of directors or on the advisory board of numerous disability rights and community rights organizations including: Disability Policy Consortium, Department of Public Health -Office on Disability, Disability Law Center, Women Waging Peace Internationally, and the Boston Coalition of 100 Black Women.

34. Ms. Starks' work at the Center and in the community is important to her and the community she serves, particularly people of color with disabilities. The Center is a community controlled and consumer driven organization. The Center's staff is ninety-percent people with disabilities. The Center provides consumer advice and advocacy on various issues including: education, employment, health care, housing, transportation, and rehabilitation. The Center's stated goals are : to act as a role model for the community of people with disabilities; to obtain inclusiveness in the state of Massachusetts for people with disabilities and to enhance the lives of all people with a disability. Ms. Starks' work at the Center is regularly disrupted by either her own or her clients inability to readily access public transportation because of the defendants' failure to provide accessible services.

35. Ms. Starks has chaired many meetings at the Independent Living Center which were either delayed or canceled because people had difficulties with transportation as a result of the MBTA's failure to provide accessible services.

36. At least once per month Ms. Starks is not able either to get to, or exit from, the train

11

platform because the elevators at the train stations are broken. Signs are not posted warning of the broken elevators nor are any announcements made warning of the broken elevators. For example: In September 2000, while traveling home from work home, Ms. Starks was trapped underground at the Roxbury Crossing, Orange line station because the elevator was broken. A 15 minute trip lasted 2 hours. Again in August 2000, she was unable to take the train home from work because the elevators at the Green Street station, and Stony Brook station on the Orange line were not operational. Despite Ms. Starks complaints to the MBTA, the elevator at Green Street remained unusable, and the station inaccessible to people with disabilities, for two days. In March 2001 the elevator was broken in the Roxbury station for three days.

37.     Ms. Starks regularly encounters difficulties in using the buses:

    a.    On average at least three times per week the buses she uses daily do not have working lifts. Buses regularly pass her by because they do not have working lifts.

    b.    At least one time out of the two times per month that she tries to use MBTA buses to attend meetings at the Morgan Memorial Goodwill Center, on Harrison Avenue in Boston the lift is broken.

    c.    In 1996 while at Dudley Station waiting to board a bus, Ms. Starks was told by a bus driver that "buses were for people, not wheelchairs."

    d.    On August 3, 1997, Ms. Starks was severely injured when a bus driver pressed the wrong buttons and instead of going up, the lift closed on her feet. She was taken to the Beth Israel Hospital for treatment.

    e.    In August 1997 Ms. Starks was waiting to board a bus. The driver loaded all the non-disabled passengers first and then the driver informed her that the bus was full and he was unable to take her.

    f.    On December 19, 2001 while traveling to a meeting Ms. Starks was stuck for one hour on a bus at the Dudley Station because the lift was broken. The city fire department was called after she complained and only then was Ms. Starks able to get off the bus.

These experiences are stressful, humiliating, time consuming, and often prevent Ms. Starks from meeting important obligations.

38.   Dirty elevators are a chronic problem that Ms. Starks encounters on a daily basis traveling to and from work, or meetings. For example, on April 4, 2002, Ms. Starks took the train to a Massachusetts Rehabilitation Commission meeting. The elevators at Roxbury Crossing and at South Station were both soiled with urine, feces, and garbage. The wheels on her electric wheelchair were foul smelling by the time she completed her trip. Often when arriving at work, Ms. Starks must ask other employees at the Center to help wash the wheels of her wheelchair so urine and feces will not smear the carpet.

39.   Ms. Starks has regularly filed written and verbal complaints with the MBTA on behalf of herself and other consumers who are served by the Center. She files complaints about buses which fail to stop for persons with disabilities, buses with no lifts or buses which have a decal claiming the bus is wheelchair accessible but the lift is broken, and elevators in train stations that are out of order or unusable because they are so unsanitary (soiled with feces, urine and garbage). Ms. Starks has filed complaints to the MBTA about drivers who are "rude and discourteous"toward persons with disabilities, because of their disabilities.

**Eileen Brewster**

40.   Eileen Brewster is a 45 year old woman who has a disability. She has Multi-joint Arthritis, Fibromyalgia, and Lupus. Ms. Brewster resides independently in Mission Hill, Massachusetts. Ms. Brewster has limited movement of her entire body. She is unable to walk and has severe limitations in the use of her hands, arms and legs. Ms. Brewster

13

uses an electric wheelchair for mobility. Ms. Brewster depends on the MBTA for all of her travel needs except to medical appointments. She has encountered many problems with the buses and trains as a result of the defendants' failure to provide accessible services. Some of the problems encountered by Ms. Brewster include: broken lifts, broken and dirty elevators, no ramps at sites where there are no lifts, and rude and discourteous drivers.

41. Ms. Brewster relies on the MBTA buses and trains at least once per week for personal business appointments (paying bills), to visit friends, to get to social events, and to shop. Ms. Brewster had numerous bad experiences with the MBTA where she missed medical and social appointments. She cannot rely on the MBTA for her medical appointments and only uses the medical ride which is offered to her by her MassHealth. She also had many problems with the RIDE (the paratransit system operated by the MBTA) and so the RIDE is also not a viable means of transportation to her medical appointments. She uses the RIDE if she has to go someplace outside of the city and it is not an urgent appointment.

42. Ms. Brewster has completed high school and some college. She is a registered Individual Consumer Consultant (ICC) with the Massachusetts Rehabilitation Commission (MRC). As an ICC she advises and counsels individuals on what services are available for them as people with disabilities. For example, she informs clients about available services such as: Rehabilitation Services, Independent Living Centers; where and how to proceed with purchasing equipment such as a wheelchair; how to file a complaint on a housing or on other reasonable accommodations matters.

43. Ms. Brewster has encountered numerous problems trying to board buses at the bus stop located directly outside the building where she resides. For example drivers pass her by when they see she is a person with a disability, or stop the bus to inform her that the lift is broken.

44. Ms. Brewster missed a medical appointment for orthopedic shoes in 1998 because the bus she boarded had a broken lift. When she arrived at the stop near the orthopedist she could not exit the bus. She was trapped in the bus because the lift did not work. Ms. Brewster sat in the bus for over forty-five minutes and missed her appointment.

45. In January 2002 Ms. Brewster was traveling to the South Bay Mall in the Dorchester area. Ms. Brewster waited for over forty minutes at the bus stop as one bus driver after another passed her by. She went to the nearest MBTA station, Ruggles, and complained to the supervisor. She was advised that the lifts on the buses were broken. A bus with a working lift was located and Ms. Brewster went to the mall. On her way back she encountered the same problem. Ms. Brewster waited at the mall station at night for two hours in freezing rain before she was able to board a bus and travel home. The next day she called the MBTA complaint phone line and reported the incident. No one from the MBTA returned her call.

46. Ms. Brewster's public transportation options were so limited that she was forced to move to the Mission Hill area where she had more options on traveling. She moved because at her old residence near Boston College her only means of travel was the Number 65 bus. She lived under constant stress due to the defendants' failure to provide appropriate wheelchair ramps or lifts at near by Green Line stations. When she had medical, social,

15

shopping or any other appointments, she had to leave home several hours in advance, just to be certain that she would arrive at her destination on time.

47.    Moving only partly resolved her transportation issues. Now when using the "E" Line the assistive devices are often out of service. Ms. Brewster has to go on the opposite side where the devices are working, and board the "T" going in the wrong direction then ride until it makes a complete round trip and heads in the direction that she needs to go. A twenty minutes trip turns into an hour and a half to two hours.

48.    During the Summer 2000, Ms. Brewster's social plans for a dinner and a movie with friends were canceled because the elevator at the Back Bay in Boston did not work. Ms. Brewster tried to get assistance from the MBTA employees and after approximately forty-five minutes she gave up and returned home. There were no signs posted at that station or the previous station about a broken elevator.

49.    When Ms. Brewster travels to the South Station in Boston she uses the Orange line which she boards at the Ruggles station and then switches to the Red line at Downtown Crossing. In order to switch to the Red line, unlike people without mobility disabilities, she has to go outside the station, travel for two blocks on her wheelchair, to get to the side of the station that is accessible.

50.    Ms. Brewster prefers to use the buses instead of the trains because the elevators in train stations are kept in an unsanitary condition and smell of feces, urine and garbage. The elevators are also located in dimly lit areas and are usually far away from public areas.

51.    Ms. Brewster filed all her complaints through the MBTA phone complaint line. She has called the following numbers regarding her complaints (617) 222-5855, (617) 222-5856,

16

and (617) 222-5200.  She has never received a response from the MBTA.

**Rogera Robinson**

52.  Rogera Robinson is a woman with a disability.  She has arthritis all over her body.  The

arthritis most severely affects her knees.  Ms. Robinson sometimes relies on a cane for

mobility.  She resides in Brighton, Massachusetts.  Ms. Robinson relies on the MBTA

buses for her travel needs.  She sometimes uses the trains.  She frequently uses the

MBTA buses; some weeks she rides the buses up to six to eight times.   Ms. Robinson is

quite active in many disability rights organizations and was one of the original founders

of the Minorities with Disabilities Advocacy Center (MDAC) which was re-named the

Vivienne S. Thomson Independent Living Center/MDAC .  Ms. Robinson has

encountered problems with using public transportation as a result of the defendants'

failure to provide accessible services.   Ms. Robinson has endured the MBTA bus drivers'

failure to lower buses (kneeling bus) so that she can safely access the bus.

53.  Due to her disability, she often has problems getting on or off buses because the steps are

not lowered for her.  The steps on MBTA buses are too high for her to climb and require

more flexibility than her knees can handle.

54.  On nine out of ten bus rides that she takes, bus drivers fail to lower the steps for her.  On

many occasions Ms. Robinson has asked the driver to lower the steps for her and she has

received many different responses.  She has been told that the steps were not working;

she has been ignored or the drivers are rude to her.   Bus drives fail to lower the steps

even when they see Ms. Robinson struggling to pull herself up, using the hand rails at the

bus entrance. She is simply ignored.

17

55. On one particular ride, Ms. Robinson encountered a driver who did not lower the steps and then ignored her while she was clearly struggling to make it up the steps on her own. Finally, a passenger who was standing in line behind her, placed his hand on her buttocks and pushed her onto the bus. This situation embarrassed Ms. Robinson, but she could not allow herself to be embarrassed or offended that this stranger touched her in this manner. Instead, she was forced to be grateful for his help.

**John Alleyne**

56. John Alleyne is a man with a disability. He has Multiple Sclerosis. Mr. Alleyne is unable to walk and uses an electric wheelchair for mobility. He resides independently in Brockton, Massachusetts. Mr. Alleyne depends on public transportation for his travel needs. Mr. Alleyne uses the commuter rail and the Red line at the South Station at least three times per week. As a result of the Defendants' failure to provide accessible services, Mr. Alleyne encounters many problems with trying to access MBTA buses and trains, including broken elevators and broken wheelchair lifts.

57. In May of 2001 the elevators at South Station remained broken for an extended period of time and Mr. Alleyne was unable to access the Red line. Mr. Alleyne was forced to ride his electric wheel chair from South Station to Downtown Crossing in order to access the "T". This is both time consuming and tiring. If the elevator at South Station works he can easily access the train.

58. Because the elevator at South Station was out of service, Mr. Alleyne faced practically insurmountable obstacles getting to the Spaulding Rehabilitation Center for treatment and services. He faced the same obstacles traveling to the Vivienne S. Thomson Independent

18

Living Center where he volunteers his time as a peer counselor for people with disabilities.

59. Mr. Alleyne was forced to stop going to Massachusetts Eye and Ear Infirmary for treatment and services because there is no elevator at the Charles Street station on the Red line. He had to take the "T" to Park Street station stop and ride his electric wheelchair through extremely dangerous traffic and various obstacles created by constructions for the Boston's Big Dig project. Mr. Alleyne was fearful of the commute and did not wish to put his life at risk trying to navigate through traffic in order to get treatment at the Massachusetts Eye and Ear Infirmary. Mr. Alleyne was forced to find alternative treatment sites. He had to compromise his standard of medical care in order to remain physically safe.

60. In November, 2001, there was a community meeting at the Center with representatives from the MBTA. This meeting was important for Mr. Alleyne because it was an opportunity to speak with MBTA officials about the barriers that he face as a person with a disability who is not afforded adequate access to public transportation. He was planning to discuss broken elevators, lifts, and other issues. Because he encountered MBTA buses with broken lifts, or no lifts at all, Mr. Alleyne's commute to the Center in Jamaica Plain took three hours. Mr. Alleyne arrived late to that meeting even though he allowed himself sufficient time to get to the Center.

61. Mr. Alleyne has filed numerous complaints through the MBTA complaint line. He also complained to inspectors on duty, MBTA staff, and train conductors.

**Gene Smith**

19

62. Gene Smith is a woman who has a disability. She has Multiple Sclerosis. Due to her disability, Ms. Smith's use of her legs is limited. She uses an electric scooter and a cane for mobility. Ms. Smith resides in the Dorchester area and relies on the MBTA buses and trains to travel. She only uses her cane when she travels on MBTA buses and trains because of the numerous problems she has encountered due to the defendants' failure to provide accessible services. The main problems encountered by Ms. Smith are broken bus lifts and broken elevators.

63. Even using her cane Ms. Smith still faces great difficulties accessing the bus. She is often unable to access the seats reserved for persons with disabilities. Because of her disability, her body, especially her legs, are extremely weak. It is difficult for Ms. Smith to stand in one position for any length of time. When the bus is in motion, it is not only difficult but also dangerous for her to remain standing.

64. In October, 2001, while traveling on a bus from Dorchester to the Beth Israel Hospital to see her doctor, she was unable to get a seat on the crowded bus. Ms. Smith saw a non-disabled passenger seated in a seat that is designated for the elderly and disabled. She asked the passenger to please allow her to have the seat but the passenger refused. Ms. Smith sought the help of the bus driver. The bus driver shook his head and laughed at Ms. Smith.

65. In the summer of 2001. Ms. Smith took the bus home from her doctor's office. On that day, Ms. Smith's feet were swollen and painful. When she boarded the bus, all of the seats were taken including the seats designated for disabled and elderly passengers. She asked for the bus driver's help, but she was ignored. The other passengers on the bus

20

stared at Ms. Smith in such a hostile manner that she felt humiliated.

66. On or about January 1999, Ms. Smith was seriously injured while trying to exit a bus through the back door. Due to her disability, it took her some time because she is only capable of going down one step at a time. At the last step with one foot on the ground and while in the process of removing her other foot from the step the bus driver closed the door on her ankle. Other passengers on the bus screamed for the driver to open. The driver took a long time to open the door. By the time he opened the door to release her foot, Ms. Smith had already suffered extreme pain and considerable injuries.

67. Recently Ms. Smith attempted to go back to college. She enrolled at Bunker Hill Community College, but was devastated to arrive at Community College Station on the Orange Line and find that she could not leave the platform because there is no elevator or accessible exit for her scooter. When she had a chance to confront the former MBTA chairman Mr. Sullivan on this matter, he discounted her inability to access an education with a smile and a trite promise to "work on it." After two years the station is still inaccessible.

**Reginald Clark**

68. Reginald Clark is a man with a disability. He is legally blind and uses a white cane when he travels. Mr. Clark does not drive and relies upon public transportation. He resides in Brookline and travels by bus on a daily basis to attend meetings, medical appointments, and social events. As a result of the MBTA's failure to provide accessible services, Mr. Clark encounters many problems with transportation. Some problems encountered by Mr. Clark include: drivers failing to pull next to the curb and instead stopping in the

21

middle of the street; drivers failing to announce stops; and drivers failing to assist him with getting a seat designated for the elderly and the disabled.

69. When bus drivers fail to pull close to the curb it presents a safety concern for Mr. Clark. He must step onto the street, without being able to see if there is traffic approaching, in order to board or exit the bus.

70. MBTA bus drivers routinely fail to announce stops on the bus lines. In October 2000, Mr. Clark asked the bus driver to let him know when he reached his stop. The driver was talking on his cellular phone and neglected to announce the stop. When Mr. Clark asked him about his stop, he was told that the driver had already passed it. Mr. Clark was ushered off the bus at the next stop and had to find his way back to the stop he needed. This was extremely difficult and terrifying for Mr. Clark.

71. On Friday, December 14, 2001, the bus driver failed to announce any of the stops.

**Louise Beach**

72. Louise Beach is a 55 year old woman with a disability. Ms. Beach has Muscular Dystrophy and is legally blind. Her physical disabilities prevent her from climbing stairs and limit her ability to walk. She uses a cane for mobility. Ms. Beach is an Outreach Peer Counselor at the Vivienne S. Thomson Independent Living Center/Minorities with Disabilities Advocacy Center (Center). Ms. Beach resides in Roxbury and occasionally uses the MBTA buses and trains for travel. Ms. Beach presently chooses to use the RIDE for transportation rather than MBTA trains and buses because of the many difficulties and dangers that she has endured using the MBTA in the past.

73. Problems encountered by Ms. Beach include: drivers failing of to announce stops causing

22

her to get off at the wrong stop; drivers failing to assist persons with disabilities in locating and securing the seats designated for people with disabilities on crowded buses; drivers failing to pull close enough to the curb for people with visual impairments to safely exit the bus; drivers moving the bus quickly away from the curb before she could safely find a seat; drivers who fail to employ the "kneeling" mechanism on buses so equipped; drivers who request identification from her to prove her disability; drivers who behave rudely to Ms. Beach because of her disability; and broken elevators at train stations.

74.     Ms. Beach's most recent ride an MBTA train was May 2001. Ms. Beach was traveling with a Personal Care Attendant (PCA). Even with the help of her PCA, it was still incredibly difficult to access a train at South Station because the elevator was broken. Ms. Beach was unable to use the stairs because of her Muscular Dystrophy.

75.     Ms. Beach has vast experience with MBTA employees who treat her with indifference or discourtesy because of her disability. For example, in the winter of 1999-2000 while traveling home she asked a bus driver to please pull closer to the curb so that she could safely exit the bus. The driver stated "I can't do special favors for you because you're blind or disabled." Ms. Beach was let off the bus in an unsafe spot where the snow was piled high. Because she is blind it was dangerous for her to maneuver her way back to the curb.

76.     Again in the Spring of 1999 traveling home from school the bus driver not only failed to pull near the curb, but, when Ms. Beach asked for assistance he told her that he had a busload of people to worry about. The driver never assisted Ms. Beach and she had to get

23

off the bus into a busy street.

77.   Ms. Beach has a long and productive work history including positions at the National

Joslin Diabetic Association, Consumer Law Center, and the Jewish Memorial Hospital.

At all times Ms. Beach used buses and trains as her primary means of transportation.

Due to the problems she has experienced she is now afraid to make the MBTA buses and

trains her main means of transportation.

### POLICIES AND PRACTICES OF THE MBTA

78.   The MBTA is the fourth largest transit system in the United States. It boasts the oldest

subway transit system in the nation. The MBTA's service district includes seventy-eight

communities in Eastern Massachusetts, providing approximately 819,700 one way

passenger trips per day with a daily ridership of over 1,052,750. The MBTA employs a

workforce of approximately 6,500 persons and operates 365 days a year. In 2001 the

MBTA reported to the Federal Transit Administration revenue from fares totaling

$250,311,545; funds from federal assistance totaling $91,125,876; and total operating

funds from fares, local, state, federal and other sources totaling $898,950,623. By the

MBTA's own figures at least ten percent of the MBTA's total operating funds are derived

from the federal government.

79.   The U.S. Census Bureau estimates that in the year 1991 over 49 million Americans had a

disability. A U.S. census report attached to this statistic links the presence of a disability

with lower income levels and an increased likelihood of poverty.[1] For this reason it is

more likely that persons with disabilities will require accessible public transportation for

---

[1] John McNeil, *Disability*, U.S. Census Bureau, Population Division and Housing and Household
Economic Statistics Division, 1991-1992.

24

daily travel. The U.S. census conducted in the year 2000 demonstrates that there are approximately 968,595 people with disabilities over the age of 21 living in the state of Massachusetts. The 1990 U.S. census reported approximately 125,889 persons with disabilities lived in Suffolk County, within the MBTA's service area (2000 numbers by county are not yet available).

80. The MBTA runs buses and trains in the city and nearby suburbs that are regularly used by Plaintiffs and other persons with disabilities. Plaintiffs are regularly prevented from readily using the MBTA. Some plaintiffs cannot access the MBTA at all, others are not able to use it in a manner equal to the non-disabled population when they need to do so.

81. The MBTA operates fixed route transit lines along prescribed routes according to a fixed route schedule as these terms are used in the ADA. 42 U.S.C. §12141(3).

82. The MBTA advertises and holds itself out to the public as offering routes on its buses and trains that are accessible to riders with disabilities.

83. On a persistent, ongoing, and systemic basis the defendants have failed, to provide the plaintiffs with equal access to the fixed route public bus and train lines that it operates. Through its acts and omissions, set out more fully in the paragraphs that follow, the defendants have denied the plaintiffs equal access to the buses and trains that it operates.

**Bus Lines**

84. Defendants have failed to make the MBTA's fixed route public bus system readily accessible to and usable by plaintiffs and other persons with disabilities by, among other things:

    a.     failing to adequately inspect, maintain, and service mechanical assistive devices

such as bus lifts, which are needed to allow persons with mobility impairments to board and disembark. Lifts on defendant's buses, marked in the schedule and on the bus itself as accessible, are frequently malfunctioning or non-functioning, thereby denying basic public transportation services to plaintiffs and other people with disabilities;

b.      failing to adequately inspect, maintain, and service the bus doors through which persons with mobility impairments board and disembark. The doors and steps on defendants's buses, marked in the schedule and on the bus itself as accessible, are frequently malfunctioning or non-functioning, thereby denying basic public transportation services to plaintiffs and other individuals with disabilities.

c.      failing to adequately inspect and maintain the safety equipment such as clamps used to secure the wheelchairs of persons with mobility impairments on buses the belts and straps used to secure people with mobility impairments inside buses. These vital safety devices are frequently missing, malfunctioning, or non-functioning;

d.      failing to adequately  train and supervise its employees, including drivers, regarding the proper and safe use of the accessibility and safety devices necessary to provide equal access to persons with disabilities on the buses MBTA operates, including lifts, doors, clamps, and safety straps;

f.      frequently and persistently placing  non-accessible buses on bus lines marked in the

26

schedule or in other ways purported to be bus lines accessible to people with disabilities, including people who use wheelchairs;

g.   frequently and persistently failing to provide alternative transportation for people with disabilities during renovations/construction of city streets.

h.   frequently and persistently failing to assign a sufficient number, as determined by MBTA's own analysis, of buses with working lifts to bus lines designated as accessible to persons with disabilities, including persons who use wheelchairs;

i.   frequent and persistent failure of MBTA bus drivers' and other personnel to properly and safely use the assistive devices needed to provide equal access to persons with disabilities on bus lines operated by the defendants, including lifts, doors, clamps, and safety straps. On numerous occasions, defendants' employees have failed to, lacked knowledge of the proper use of, or openly refused to operate these assistive devices, seriously endangering plaintiffs' health and safety.

j.   frequent and persistent failure of MBTA bus drivers' to stop for or to pick up plaintiffs and other riders who have clearly identifiable disabilities and are waiting at bus stops, because of plaintiffs' disabilities.

k.   frequent and persistent failure of MBTA bus drivers to allow persons with disabilities to board buses, because of the person's disability.

l.   frequent and persistent failure of MBTA bus drivers to deploy lifts or lower the buses "kneeling" mechanism, when requested by plaintiff's or other people whose disabilities are not readily apparent.

m.     frequent and persistent failure of MBTA bus drivers to provide plaintiffs or other persons with disabilities with adequate time to complete their boarding or disembarking from defendants' vehicles before continuing en route.

n.     frequent and persistent failure of MBTA bus drivers' to clearly announce the bus number and make stop announcements, severely impeding the ability of visually impaired persons to know when to disembark defendant's buses; and

o.     frequent and persistent tendency of MBTA personnel to treat individuals with disabilities in a discourteous and unprofessional manner because of their disability, including MBTA employee's failure to adequately document and address complaints about accessibility to the MBTA bus system.

## Train Lines

85.    Defendants have failed to make the MBTA's fixed route public train system readily accessible to and usable by plaintiffs and other persons with disabilities by, among other things:

a.     frequent and persistent failure to maintain elevators in MBTA stations in operating condition;

b.     frequent and persistent failure to adequately supervise and monitor the cleanliness of elevators in MBTA stations;

c.     failing to provide accurate and conspicuous information, at stations and/or over the telephone, as to whether or not elevators in specific MBTA stations are in service;

d.     frequent and persistent failure to provide prompt alternative accessible transportation to riders with mobility disabilities when a designated accessible station is not in fact accessible to said riders;

e.     frequent and persistent failure of MBTA employees' to respond to calls from riders with disabilities seeking assistance in accessing the public train system;

f.     failing to adequately train its employees on the use of bridge plates, devices which act as a bridge between the train platform and the train car so riders with mobility impairments can safely board or disembark trains;

g.     frequent and persistent failure to ensure that bridge plates are available so riders with mobility impairments can safely board and disembark the trains;

h.     failing to employ adequate numbers of personnel to ensure that riders with disabilities have equal access to the trains and the train stations in general;

i.     failing to provide an adequate number of designated wheelchair spaces on trains and to properly mark and designate those cars that do have wheelchair spaces;

j.     failing to implement a proper emergency evacuation program for the safe evacuation of riders with disabilities;

k.     frequent and persistent failure of MBTA employees to provide sufficient time for persons with disabilities to board and disembark from the trains;

l.     frequent and persistent failure of MBTA employees, upon arriving at a given station, to clearly announce the train line and destination and current stop, severely impeding

29

the ability of visually impaired persons to know when to board or disembark from the defendants' trains;

n.   frequent and persistent failure to provide accessible paths of travel for people with disabilities, including persons who use wheelchairs, in and around MBTA stations;

o.   frequent and persistent failure to provide alternative transportation for people with disabilities during renovations/construction of city streets;

p.   frequent and persistent tendency of MBTA employees to treat plaintiffs an other individuals with disabilities in a discourteous and unprofessional manner, because of their disabilities, including MBTA employees' failure to adequately document and address complaints about accessibility to the MBTA train system.

86.   Defendants' conduct, as set forth herein, violates clearly established federal law.

87.   Defendants are continuing to discriminate against plaintiffs and other persons with disabilities based on their disabilities, by denying plaintiffs and other persons with disabilities equal access to fixed route public transit, resulting in ongoing and irreparable injury.

88.   Consumers and the Center actively tried to resolve the problems they have encountered with the buses and trains by meeting with the former MBTA Chairman, Kevin J. Sullivan.  Nothing was resolved at this meeting.

89.   In August 2000 the Center arranged a protest outside the Dudley station with the support of Senator Diane Wilkerson and State Representatives Gloria Fox and Marie St.Fleur. This protest was attended by many of the named plaintiffs as well as other interested

persons, both with and without disabilities. This major event received media coverage

from the radio station, WILD. It was also well publicized in the Center's newsletters to

consumers. However, the only result of the protest was a proposed meeting between the

Center and Robert Prince, General Manager at that time.

90. The proposed meeting was scheduled for September 2000. The meeting was also to be

attended by Senator Wilkerson. However, the meeting never occurred because Mr.

Prince refused to attend.

91. On November 7, 2001 the Center finally met with Mr. Sullivan and Mr. Mulhern, the new

MBTA General Manager. In attendance at the meeting were several of the named

plaintiffs, Senator Diane Wilkerson and more than 30 consumers from various towns in

Massachusetts including: Boston, Brookline, Brockton, Salem, Lynn, Cambridge,

Roslindale, Dorchester, and Roxbury. At the meeting plaintiffs and other consumers

described to MBTA representatives in great detail the difficulties people with disabilities

encountered with the MBTA. Mr. Sullivan and Mr. Mulhern agreed to look into the

problem and assured the Center, the plaintiffs in attendance, and the community that

changes would happen in the near future. Mr. Sullivan and Mr. Mulhern expressed a

desire to anonymously ride the trains and buses with people with disabilities to see, first

hand, what they experience. Almost a year has past and this ride has not taken place.

31

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

## VIOLATION OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT, 42 U.S.C. §12131 ET SEQ., BY THE MBTA

92. In enacting the Americans with Disabilities Act of 1990 ("ADA"), Congress made specific findings that society tends to isolate and segregate people with disabilities; that individuals with disabilities continually encounter various forms of discrimination, including not only exclusion but also the failure to make modifications to exclusionary criteria. Congress stated that the Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals; that the continuing existence of unfair and unnecessary discrimination denies individuals with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our free society is justifiably famous; and that continuing existence of discrimination and prejudice against people with disabilities cost the United States billions of dollars in unnecessary expenses. 42 U.S.C. §12101(a).

93. The express purpose of the ADA is to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities; to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities; and to ensure that the federal government plays a central role in enforcing the standards established in the Act on behalf of individuals with disabilities.

32

42 U.S.C. §12101(b).

94.     Each individual plaintiff is a "qualified individual with a disability" under the meaning of Title II of the ADA, 42 U.S.C. §12131(2).

95.     The MBTA is a "public entity" within the meaning of Title II of the ADA. 42 U.S.C. §12131(1).

96.     The MBTA operates a fixed route system of public transportation, under the meaning of Title II of the ADA. 42 U.S.C. §12141(3).

97.     Through the acts and omissions alleged herein, the defendants have, by reason of plaintiffs disabilities; excluded plaintiffs from participation in the MBTA programs, services and activities; denied plaintiffs the benefits of the MBTA programs, services, and activities; and subjected plaintiffs to discrimination in violation of Title II of the ADA, 42 U.S.C. §12132.

98.     The defendants' acts and omissions set forth herein are in violation of the equal access and nondiscrimination requirements set forth in Title II of the ADA, and the regulations promulgated thereunder, and have resulted in injury to plaintiffs.

99.     The defendants' conduct constitutes an ongoing and continuous violation of Title II of the ADA and, unless restrained and enjoined from doing so, the MBTA will continue to violate Title II of the ADA. The defendants' acts and omissions, unless enjoined, will continue to inflict irreparable injuries for which plaintiffs have no adequate remedy under the law.

## SECOND CAUSE OF ACTION

**VIOLATION OF SECTION 504 OF THE REHABILITATION ACT OF 1973, AS AMENDED, BY THE MBTA**

100.   Each individual plaintiff is an "otherwise qualified individual with a disability" under the meaning of Section 504 of the Rehabilitation Act, 29 U.S.C. §794 ("Section 504").

101.   The MBTA receives a significant portion of its operating funds from Federal sources, therefore it operates a "program or activity receiving Federal financial assistance" as defined by Section 504.

102.   Through the acts and omissions alleged herein, the MBTA has, by reason of plaintiffs disabilities: excluded the plaintiffs from participation in the MBTA's programs, services and activities, denied the plaintiffs the benefits of the MBTA's programs, services, and activities, and subjected the plaintiffs to discrimination.

103.   The defendants' acts and omissions set forth herein are in violation of the equal access and nondiscrimination requirements set forth in Section 504, and the regulations promulgated thereunder, and have resulted in injury to plaintiffs.

104.   The defendants' conduct constitutes an ongoing and continuous violation of Section 504 and, unless restrained and enjoined from doing so, the defendants will continue to violate Section 504.   The defendants' acts and omissions, unless enjoined, will continue to inflict irreparable injuries for which plaintiffs have no adequate remedy under the law.

WHEREFORE, plaintiffs request the relief set forth below

## **PRAYER FOR RELIEF**

WHEREFORE, the plaintiffs pray that this Honorable Court order relief as follows:

1.  Certify the class described in the complaint;

2.  Declare that the defendants' acts and omissions complained of herein deny the plaintiffs equal access to public transportation in violation of the Americans with Disabilities Act of 1990 and Section 504 of the Rehabilitation Act of 1973 and regulations thereunder as alleged in the complaint;

3.  Issue a permanent injunction to require defendants to comply with the Americans with Disability Act of 1990 and Section 504 of the Rehabilitation Act of 1973, and regulations enacted thereunder, with respect to providing individuals with disabilities full and equal access to its public transportation operation and system, by among other things:

    a.  assuring that buses scheduled to be, and/or marked as, accessible to persons with disabilities actually be accessible by adequately inspecting, maintaining and servicing all mechanical assistive devices such as: bus lifts, bus doors, safety claps and belts;

    b.  assuring by a routine of monitoring and maintenance that all other necessary assistive devices such as: bridge plates, telecommunication devices, LED displays, signage, and other devices as required by law or regulation are in place, fully operational, and can be used by consumers in a safe manner;

    c.  assuring by a routine of monitoring and maintenance that each subway station has at least one elevator that is fully operational, in working order, providing access to all train lines served by the station (in both directions), well lighted both inside

the cab and in the elevator boarding areas, sanitary both inside the cab and in the elevator boarding areas, and adequately patrolled to ensure the safety of the consumers. If an elevator is not operational a system must be in place to alert consumers in transit, such as clear and audible announcements made over the public announcement system on the trains as well as in the station, and signs posted in conspicuous locations on the subway trains, as well as in the station, alerting consumers to the location of the station where the elevator is out of service, and providing directions to the nearest station with an operational elevator;

d.    clear and audible announcements shall be made over the public address system of buses and trains in a timely and consistent manner at each stop announcing the current location of the vehicle and its destination;

e.    the MBTA will assure that all bus and train operators are adequately supervised and trained to provide reasonable assistance to all individuals with disabilities assuring equal access to the MBTA. This training must include but is not limited to operating mechanical assistive and safety devices, sensitivity to the unique travel needs of persons with disabilities and, ensuring that individuals with disabilities have priority access seats that are designated for the elderly and disabled;

f.    each and every bus must approach all bus stops and stations at a safe and appropriate speed, and come to a stop at a distance from the curb close enough to ensure reasonable safety to disembarking passengers with disabilities;

36

g.  assuring by a routine of monitoring and maintenance that each bus stop or station shall be free and clear of all impediments, including but is not limited to illegally parked vehicles, snow, ice, or any other type of debris;

h.  assuring that alternative transportation will be provided for people with disabilities during renovations/construction of city streets.

i.  assuring by a routine of monitoring and maintenance that paths of travel within and around MBTA stations are accessible to people with disabilities, including those who use wheelchairs, and free of obstructions;

j.  establishing a monitor and system of monitoring and reporting, independent of the MBTA's current system, accountable to the community and responsible to track the MBTA's performance in responding to the violations and prayers for relief listed above. The monitor will compile data on the MBTA's progress and complaints having to do with disability access or accommodations.

4.  Issue a permanent injunction to require the defendants to refrain from discrimination against individuals with disabilities who use their public transportation system;

5.  Award the plaintiffs their costs and reasonable attorneys' fees; and

6.  Grant such further relief as is equitable and just.

Dated: July 25, 2002

BY THEIR ATTORNEYS

_____
Daniel S. Manning, BBO#317860
Greater Boston Legal Services
197 Friend Street
Boston, MA 02114
(617) 603-1575

_____
Taramattie Doucette, BBO#555948
Greater Boston Legal Services
197 Friend Street
Boston, MA 02114
(617) 603-1575

_____
Caryn Mitchell-Smith, BBO#641514
Greater Boston Legal Services
197 Friend Street
Boston, MA 02114
(617) 603-1575

JS 44
(Rev. 12/96)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
Janis Harris, Matlyn D. Starks, Eileen Brewster, Rogera Robinson, John Alleyne, Gene Smith, Reginald Clark, and Louise Beach

## DEFENDANTS
Massachusetts Bay Transportation Authority, James H. Scanlon, in his official capacity as Acting Secretary of Transportation and MBTA Chairman, Michael H. Mulhern, in his official capacity as MBTA General Manager

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF  Suffolk
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT  Suffolk
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) (617) 371-1234
Greater Boston Legal Services
197 Friend Street, Boston, MA 02114
Daniel Manning, Taramattie Doucette, Caryn Mitchell-Smith

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff
☒ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## V. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

### CONTRACT
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholders' Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability

### REAL PROPERTY
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

### TORTS
**PERSONAL INJURY**
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury

**PERSONAL INJURY**
☐ 362 Personal Injury - Med. Malpractice
☐ 365 Personal Injury - Product Liability
☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

### CIVIL RIGHTS
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/ Accommodations
☐ 444 Welfare
☒ 440 Other Civil Rights

### PRISONER PETITIONS
☐ 510 Motions to Vacate Sentence
**Habeas Corpus:**
☐ 530 General
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

### FORFEITURE/PENALTY
☐ 610 Agriculture
☐ 620 Other Food & Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 R.R. & Truck
☐ 650 Airline Regs.
☐ 660 Occupational Safety/Health
☐ 690 Other

### LABOR
☐ 710 Fair Labor Standards Act
☐ 720 Labor/Mgmt. Relations
☐ 730 Labor/Mgmt. Reporting & Disclosure Act
☐ 740 Railway Labor Act
☐ 790 Other Labor Litigation
☐ 791 Empl. Ret. Inc. Security Act

### BANKRUPTCY
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

### PROPERTY RIGHTS
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

### SOCIAL SECURITY
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

### FEDERAL TAX SUITS
☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS – Third Party 26 USC 7609

### OTHER STATUTES
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation
☐ 470 Racketeer Influenced and Corrupt Organizations
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 895 Freedom of Information Act
☐ 900 Appeal of Fee Determination Under Equal Access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions

## VI. CAUSE OF ACTION
(CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

Plaintiffs bring this action under 42 U.S.C.§12131 et seq., for violations of Title II of the Americans with Disabilities Act, and Section 504 for violations of the Rehabilitation Act of 1973.

## VII. REQUESTED IN COMPLAINT:
☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ YES  ☒ NO

## VIII. RELATED CASE(S) IF ANY
(See instructions):
JUDGE _____  DOCKET NUMBER _____

DATE  7/25/02
SIGNATURE OF ATTORNEY OF RECORD  Taramattie Doucette

FOR OFFICE USE ONLY

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. TITLE OF CASE (NAME OF FIRST PARTY ON EACH SIDE ONLY) _Janis Harris v. Massachusetts Bay Transportation Authority, James H. Scanlon, Acting Secretary of Transportation and MBTA Chairman_

2. CATEGORY IN WHICH THE CASE BELONGS BASED UPON THE NUMBERED NATURE OF SUIT CODE LIST ON THE CIVIL COVER SHEET. (SEE LOCAL RULE 40.1(A)(1))

| | | |
|---|---|---|
| ___ | I. | 160, 410, 470, 535, R.23, REGARDLESS OF NATURE OF SUIT |
| X | II. | 195, 368, 400, 440, 441-444, 540, 550, 625, 710, 720,730, 740, 790, 791, 820, 830, 840, 850, 890, 892-894, 895, 950. |
| ___ | III. | 110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310, 315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371, 380, 385, 450, 891. |
| ___ | IV. | 220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660, 690, 810, 861-865, 870, 871, 875, 900. |
| ___ | V. | 150, 152, 153. |

3. TITLE AND NUMBER, IF ANY, OF RELATED CASES. (SEE LOCAL RULE 40.1(E))

_____

4. HAS A PRIOR ACTION BETWEEN THE SAME PARTIES AND BASED ON THE SAME CLAIM EVER BEEN FILED IN THIS COURT? ____ NO ____

5. DOES THE COMPLAINT IN THIS CASE QUESTION THE CONSTITUTIONALITY OF AN ACT OF CONGRESS AFFECTING THE PUBLIC INTEREST? __NO__

IF SO, IS THE U.S.A. OR AN OFFICER, AGENT OR EMPLOYEE OF THE U.S. A PARTY? (SEE 28 USC 2403) __N/A__

6. IS THIS CASE REQUIRED TO BE HEARD AND DETERMINED BY A DISTRICT COURT OF THREE JUDGES PURSUANT TO TITLE 28 USC 2284? __NO__

7. DO ALL PARTIES IN THIS ACTION RESIDE IN THE CENTRAL SECTION OF THE DISTRICT OF MASSACHUSETTS (WORCESTER COUNTY)? (SEE LOCAL RULE 40.1(C)) YES __NO__ OR IN THE WESTERN SECTION (BERKSHIRE, FRANKLIN, HAMPDEN OR HAMPSHIRE COUNTIES)? (SEE LOCAL RULE 40.1(D)) YES __NO__

8. DO ALL OF THE PARTIES RESIDING IN MASSACHUSETTS RESIDE IN THE CENTRAL AND/OR WESTERN SECTIONS OF THE DISTRICT? YES _____NO_____

(a) IF YES, IN WHICH SECTION DOES THE PLAINTIFF RESIDE? _Suffolk County_

9. IN WHICH SECTION DO THE ONLY PARTIES RESIDING IN MASSACHUSETTS RESIDE? _____

10. IF ANY OF THE PARTIES ARE THE UNITED STATES, COMMONWEALTH OF MASSACHUSETTS, OR ANY GOVERNMENTAL AGENCY OF THE U.S.A. OR THE COMMONWEALTH, DO ALL OTHER PARTIES RESIDE IN THE CENTRAL SECTION __NO__ OR WESTERN SECTION __NO__

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME_____ Taramattie Doucette

ADDRESS___ Greater Boston Legal Services, 197 Friend Street, Boston, MA 02114

TELEPHONE NO. (617) 603-1575

(COVER SHT-06/90)